**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE STONE FAMILY TRUST,<br><br>               Plaintiff,<br><br>      v.<br><br>CREDIT SUISSE AG, CREDIT SUISSE SECURITIES (USA) LLC, TIDJANE THIAM and DAVID R. MATHERS,<br><br>               Defendants. | Index No. 19 Civ. 5192<br><br>**COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

**Kirby McInerney LLP**
Mark A. Strauss (mstrauss@kmllp.com)
Ira M. Press (ipress@kmllp.com)
250 Park Avenue, 8th Floor
New York, New York 10177
Telephone:  (212) 371-6600
Facsimile:   (212) 751-2540

*Attorneys for Plaintiff The Stone Family Trust*

## TABLE OF CONTENTS

I.     NATURE OF ACTION ............................................................................1

II.    JURISDICTION AND VENUE ..........................................................13

III.   PARTIES ..............................................................................................13

       A.    Plaintiff ......................................................................................13

       B.    Defendants ..................................................................................14

IV.    FACTUAL ALLEGATIONS ...............................................................15

       A.    The XIV ETN ..............................................................................15

       B.    Credit Suisse Hedges Its Liabilities in Connection with XIV Using VIX
             Futures.........................................................................................17

       C.    Volatility Declines to Historically Low Levels while the Volatility-Linked
             ETP Market Experiences Considerable Growth ........................18

       D.    The Undisclosed Risk of a VIX Futures Liquidity Gap which Would
             Devastate XIV.............................................................................20

       E.    Credit Suisse Takes Steps to Protect Itself from the Risk of a VIX Futures
             Liquidity Gap ..............................................................................23

       F.    The Undisclosed Risks Materialize in a "Volpocalypse" .........25

       G.    The Inaccuracy of the Indicative Value after 4:00 p.m. ET.......29

       H.    Credit Suisse Omits to Issue a NASDAQ Listing Rule 5250(b)(1)
             Disclosure ...................................................................................33

       I.    Plaintiff's XIV Transactions and Losses ...................................37

V.     DEFENDANTS' OMISSIONS ...........................................................38

VI.    ADDITIONAL SCIENTER ALLEGATIONS...................................45

       A.    Credit Suisse's Active Involvement in the VIX Futures Market.........................45

       B.    The Individual Defendants' Familiarity with the Operations and Financial
             Results of Credit Suisse's Equity Derivatives Business .......................50

       C.    Credit Suisse's Risk Management Systems and the Personal Involvement
             of the Individual Defendants.......................................................51

D. Credit Suisse's Knowledge or Reckless Disregard of the Inaccuracy of the Indicative Value after 4:00 p.m. ET.....................................................57

VII. LOSS CAUSATION.................................................................................................57

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE ...............................................59

A. Entitlement to a Presumption of Reliance under the Fraud-on-the-Market Doctrine..........................................................................................................59

B. Entitlement to a Presumption of Reliance under Affiliated Ute Citizens of Utah v. United States ......................................................................................60

IX. NO SAFE HARBOR ...............................................................................................60

X. EXCHANGE ACT CLAIMS ......................................................................................61

XI. SECURITIES ACT CLAIMS.....................................................................................66

A. Disclaimer of any Allegation Based on Fraud..............................................66

B. The 2018 Offering........................................................................................66

C. The Misleading Statements and Omissions in the Registration Statement............67

D. Securities Act Counts..................................................................................73

XII. PENNSYLVANIA LAW CLAIMS ...............................................................................75

PRAYER FOR RELIEF .........................................................................................................79

JURY DEMAND .................................................................................................................80

Plaintiff The Stone Family Trust ("Plaintiff"), by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to its own acts, and upon information and belief as to all other matters based on the investigation conducted by and through its attorneys, which included, among other things, consultations with experts, and a review of U.S. Securities and Exchange Commission ("SEC") filings of Credit Suisse Group AG and Credit Suisse AG, press releases, and analyst reports, media reports and other publicly disclosed reports and information about Credit Suisse and the VelocityShares Daily Inverse VIX Short Term ("XIV") exchange traded note ("ETN"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF ACTION

1.      This case arises from the collapse of XIV, an Exchange Traded Note ("ETN") issued by defendant Credit Suisse AG and underwritten by defendant Credit Suisse USA (collectively, "Credit Suisse"). XIV was designed to replicate the inverse of the daily performance of the S&P 500 VIX Short-Term Futures Index (ticker symbol "SPVXSP") (the "VIX Short-Term Futures Index"), the value of which is based on a hypothetical portfolio of the two nearest-to-expiration futures contracts on the CBOE (VIX) Volatility Index (the "VIX Index").[1] This meant that, generally speaking, if the VIX Short-Term Futures Index declined by a certain percent, XIV was designed to rise by that same percentage, and *vice versa*. Accordingly, investors purchased XIV if they believed that volatility would decline in the immediate future.

---

[1] The VIX Index, referred to as Wall Street's "fear index" or "fear gauge", measures the stock market's expectation of volatility implied by S&P 500 index options. Essentially, the VIX reflects how much the market thinks the S&P 500 Index will fluctuate over the next 30 days.

2.       Unbeknownst to investors, including Plaintiff, however, there were material risks to investing in XIV which were not disclosed in XIV's offering documents or any other public statements of Credit Suisse prior to February 5, 2018.  Those risks materialized in spectacular fashion on February 5, 2018 when XIV lost 96% of its value – or approximately $1.56 billion – devastating XIV investors.  Plaintiff, which purchased more than $43 million in XIV ETNs from 3:50 p.m. to 5:38 p.m. that day, lost $37.7 million.

3.       XIV's offering documents consisted of a registration statement on Form F-3 filed with the SEC on June 8, 2017, which was subsequently amended, including by means of a prospectus supplement for the offer and sale of XIV ETNs filed with the SEC on January 29, 2018, on Form 424B2 (the "2018 Supplement"), which was incorporated into and formed part of the registration statement (the "Registration Statement").

4.       As the 2018 Supplement disclosed, Credit Suisse – like other providers of inverse and leveraged volatility-linked exchange traded products ("ETPs") – hedged its obligations with respect to XIV by purchasing and selling securities and derivatives, primarily VIX futures. Specifically, Credit Suisse hedged its XIV obligations by purchasing and selling the two nearest-to-expiration VIX futures contracts used to compute the VIX Short-Term Futures Index, to which XIV was inversely benchmarked.

5.       Credit Suisse omitted to disclose in the 2018 Supplement or otherwise prior to February 5, 2018, however, that the considerable growth which had occurred in the market capitalizations of inverse and leveraged volatility-linked ETPs (including, primarily, XIV) by at least January 29, 2018, had given rise to a highly material risk – namely, that any relatively small

spike in implied volatility would lead to a liquidity gap[2] in the VIX futures market as Credit Suisse and other ETP providers rebalanced their respective hedges. The liquidity gap would cause a tremendous feedback loop of buying which would propel VIX futures skyward, causing XIV's value to plummet in a matter of minutes. Further, the risk of a liquidity gap would be heightened during periods of low volatility because at such times – which happened to be the case as of January 29, 2018 – even relatively small absolute increases in volatility would be significant on a percentage basis. Simply put, there were not enough VIX futures contracts available from liquidity providers to absorb the demand of those instruments in such an event without a run on the market. A spike in volatility would cause a disproportionately large move in VIX futures as participants rushed to rebalance their hedges.

6. Additionally, volatility-linked ETP providers, including Credit Suisse, rebalanced their portfolios at around the same time each day – specifically, between 4:00 p.m. (when the regular trading session of the stock market closed) and 4:15 p.m. ET (when the VIX futures market closed). This meant that the Credit Suisse and other parties acting to affect its hedge would generally be purchasing VIX futures to rebalance XIV at times when demand for those futures was highest. Exacerbating the risk of a liquidity gap, XIV was also subject to the risk of front-running by Credit Suisse and other industry participants – *i.e.*, banks, market-makers, specialist volatility trading firms, and hedge funds – which had access to proprietary market data, insider knowledge about the hedging methodologies used by Credit Suisse, and non-public modelling capabilities, all of which gave them visibility into the XIV's rebalancing needs based on market movements each trading day.

---

[2] The term liquidity gap describes a discrepancy or mismatch in the supply or demand for a security.

3

7.      By at least January 29, 2018, these undisclosed risks guaranteed XIV's demise, setting the stage for the XIV to suffer a self-destructive feedback loop or "death spiral":  if volatility rose (causing XIV to decline), market participants including Credit Suisse would rush to buy VIX futures, thereby driving up their prices, which would cause XIV's value to decline further. The decline in XIV's value would necessitate that Credit Suisse purchase even more VIX futures – at higher prices – to complete its rebalancing.  This would propel VIX futures up even more, driving XIV's value down even further, and so on until XIV collapsed.  Further, when such destructive "death spiral" ultimately developed, it would obliterate XIV's value in a matter of minutes.

8.      Had the pertinent risks been disclosed, no reasonable investor, including Plaintiff, would have purchased or held XIV after 4:00 p.m. ET on any day – and certainly on any day when volatility had increased appreciably.

9.      Nevertheless, in the 2018 Supplement, Defendants not only omitted to disclose these risks, but implied that they did not exist, stating that "***we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index* ….**"

10.      Notably, Credit Suisse had included this statement in every XIV pricing supplement it issued since November 2010, when the market capitalization of volatility-linked ETPs, including XIV, was so small that the possibility of a liquidity gap in VIX futures was non-existent.  Given the considerable growth which had occurred in the market capitalizations of volatility-linked ETPs, including XIV, by at least January 29, 2018, however, the statement was materially misleading in light of the omission of what would transpire if volatility suddenly increased, which was inevitable. The 2018 Supplement nevertheless repeated the statement verbatim and without qualification.

4

11.     Furthermore, the circumstances give rise to a strong inference that, at all relevant times, and at least by January 29, 2018, Credit Suisse knew about the risk of a liquidity gap in VIX futures.  Credit Suisse had unique insider visibility into the VIX futures market as the issuer of some of the largest volatility-linked ETPs then available – not just XIV but also the TVIX (2x long VIX short-term) and the TVIZ (2x long VIX medium-term).  Credit Suisse was also a major participant in the volatility markets as a market-maker and a trader for its own account.  Credit Suisse was therefore intimately familiar with, and monitored and analyzed, *inter alia*, the volume and open interest in the VIX futures market, the slippage encountered by traders therein,[3] and other factors that would affect its ability to hedge and trade.

12.     Credit Suisse also closely monitored its ETN obligations and rebalancing requirements, including specifically those for XIV, in real time both to protect its own capital and to comply with regulatory requirements.  Credit Suisse needed to ensure that, each day, it would be able to obtain the correct number of VIX futures to hedge entirely its exposure to its volatility-linked ETNs, including XIV.  Otherwise, Credit Suisse would be left owning an unauthorized unhedged exposure to volatility through those obligations, putting its own firm's capital at risk.

13.     Credit Suisse also had to comply with, and to monitor its compliance with, *inter alia*, CBOE Futures Exchange ("CFE") Rule 412A.  Rule 412A requires large traders like Credit Suisse to notify the CFE if they hold or expect to hold 50,000 or more VIX futures contracts.  Notably, this 50,000-contract "position accountability level" was set by the CFE to "reduce the potential risk of price distortions and market disruptions".

---

[3] Slippage refers to the difference between the expected price of a trade and the price at which the trade is executed.  Slippage can occur when a large order is executed but there isn't enough volume at the chosen price to maintain the current bid/ask spread.

14.     Moreover, fearing a VIX futures liquidity gap, Credit Suisse took steps to protect itself against that risk.  Specifically, on July 1, 2016, Credit Suisse began conditioning the issuance of additional XIV ETNs on the purchasers' "agreement to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps."  This policy enabled Credit Suisse to issue additional ETNs while hedging its exposure to those securities via swaps instead of through trading VIX futures.

15.     Significantly, however, swaps do not eliminate risk but merely transfer it from one party to another.  By requiring counterparties to sell Credit Suisse swaps consistent with Credit Suisse's hedging strategy, Credit Suisse simply transferred its own risk and hedging needs to its swap counterparties.  These swap counterparties were then compelled to purchased and sell the same VIX futures that CS would have – in the absence of the swaps – needed to purchase and sell itself.  Thus, while Credit Suisse protected itself against the risk of a VIX futures liquidity gap, the liquidity-gap risks to which XIV investors were exposed continued to exist, and, in fact, dramatically increased due the expanding float and market capitalization of XIV.

16.     Barely a week after the January 29, 2018 issuance of the 2018 Supplement, the risk of a VIX futures liquidity gap suddenly materialized.  On Monday, February 5, 2018, the S&P 500 Index fell 4% amid concerns about rising bond yields and higher inflation.  By historical standards, this decline in the stock market was modest, and by the close of regular trading at 4:00 p.m. ET, the VIX Short-Term Futures Index had risen 33%, from a prior daily settlement value of 49.43 to 65.75.  As expected, XIV's Indicative Value fell an equivalent 33%, from a prior daily close of $108.37 to $72.59 as of 4:00 p.m. ET on February 5, 2018.  Trading was orderly and positions in the stock, equity options, and VIX futures markets remained liquid.

17.     However, between 4:00 p.m. and 4:15 p.m. ET, as Credit Suisse, its swap counterparties, and other providers of volatility-linked ETPs rebalanced their hedges in an overly crowded VIX futures market, the VIX futures market spiraled out of control.  The prices of VIX futures rose sharply, which in turn drove down XIV's value, resulting in a feedback loop which required the purchase of yet more VIX futures by Credit Suisse, its swap counterparties, and other volatility-linked ETP issuers, causing XIV's value to decline further, and so forth.  The undisclosed peril of a "death spiral" ensued.

18.     As a result, by 4:11.00 p.m. ET on February 5, 2018, XIV's value had plummeted to zero, recovering to a mere $4.22 by 4:15 p.m. ET.  In total that day, XIV investors lost over $1.56 billion – 96% of XIV's total value – with the bulk of that loss transpiring in the 15-minute period from 4:00 pm and 4:15pm. ET.

19.     Significantly, the collapse in XIV's value occurred after the equities market had closed its trading session, and was, therefore, largely if not completely unrelated to changes in equity market value or volatility, or any other market-wide phenomenon.  Indeed, in afterhours trading from 4:00 p.m. to 4:15 p.m. ET on February 5, 2018, the VIX Index rose just 13%, from 32.98 to 37.32.  Rather, the collapse in XIV's value during that time period was due to the undisclosed material risks inherent in the rebalancing requirements of XIV, given what was, by at least January 29, 2018, a VIX futures market that was insufficiently liquid to handle those requirements without an enormous impact on VIX futures prices.

20.     In the aftermath of XIV's collapse, on February 6, 2018, trading in the XIV was temporarily halted by market regulators.  Credit Suisse declared an "Acceleration Event" under the XIV offering documents and forced all XIV investors, including Plaintiff, to redeem their ETNs for $5.99 per ETN, a small fraction of what they had paid.

7

21.     Aside from the threat of a liquidity gap in VIX futures, the 2018 Supplement omitted to disclose an additional material risk relating to XIV – namely, that the Indicative Value disseminated by XIV's Calculation Agents generally was not updated and was therefore inaccurate from 4:00 p.m. to at least 6:00 p.m. ET each trading day.

22.     As disclosed in the 2018 Supplement, XIV's economic value was determined through a formula based on the daily inverse performance of the VIX Short-Term Futures Index. XIV's Calculation Agents calculated and disseminated that value in the form of XIV's Indicative Value under the ticker symbol XIVIV.

23.     The 2018 Supplement informed investors that the Indicative Value was "designed to approximate the economic value of [XIV] at a given time" and that such value was based upon the VIX Short-Term Futures Index, which it stated "is calculated in real time ... applying real time prices of the relevant VIX futures contracts."  Furthermore, the 2018 Supplement stated that the Indicative Value "will be calculated every 15 seconds on each Index Business Day …."

24.     The level of the Indicative Value was highly material to XIV investors.  Upon maturity, redemption, or acceleration of the ETNs, Credit Suisse was obligated to pay investors based on the Indicative Value.  The Indicative Value also allowed investors to determine whether XIV was trading at a premium or discount to its economic value.  The Registration Statement also contained important stipulations relating to the Indicative Value, namely, that if the Indicative Value ever fell to zero, it would be marked at zero "on that day, and all future days …."  In addition, if the Indicative Value fell 80% or more in a day, Credit Suisse was entitled to "affect an Event Acceleration" of the ETNs, compelling their redemption at the Indicative Value.

25.     Nevertheless, unbeknownst to investors, including Plaintiff, Standard & Poor's ("S&P"), which published the VIX Short-Term Futures Index (which was used by XIV's

Calculation Agents to compute the Indicative Value), inexplicably did not update that index from 4:00 p.m. to at least 6:00 p.m. ET on any trading day for at least the four years prior to February 5, 2018.  Instead, S&P published stale and/or inaccurate values during those time periods.  As a result, the Indicative Value of XIV was therefore also generally stale and/or inaccurate at those times.

26.     Prior to February 5, 2018, the inaccuracy of the Indicative Value from 4:00 p.m. to at least 6:00 p.m. ET was immaterial given that volatility generally was stable after 4:00 p.m. ET, when the regular trading session for stocks closed.

27.     However, after 4:00 p.m. ET on February 5, 2018, unbeknownst to XIV investors, the Indicative Value was overstated materially, obscuring XIV's instability.  VIX futures prices skyrocketed, yet because of the failure of the S&P data feed for the VIX Short-Term Futures Index to update, those price changes did not show up in the Indicative Value.  Instead, the Indicative Value remained relatively constant at around $25 for 55 minutes, as XIV's economic value plummeted to virtually nothing.  At times during this period, the Indicative Value was overstated by nearly 500%.

28.     Notably, by at least 4:10:15 p.m. ET on February 5, 2018, XIV's economic value had fallen more than 80%, entitling Credit Suisse to "effect an Event Acceleration".  Furthermore, at 4:11:00 p.m. ET, XIV's economic value temporarily fell below zero, meaning that Credit Suisse was entitled to mark the Indicative Value at zero "on that day, and all future days ….".  Yet investors had no reason to suppose that these material thresholds had been breached.

29.     Given the inaccuracy of the Indicative Value, investors like Plaintiff which traded XIV after 4:00 p.m. ET on February 5, 2018 had no way of knowing that anything was amiss with XIV, much less that the prices of VIX futures had skyrocketed after the close of the regular trading

9

session of the stock market, triggering a "death spiral" feedback loop which was wiping out XIV's economic value.  To the contrary, market trading in the XIV seemed normal.

30.     Further, given Credit Suisse's omission to disclose in the offering documents – or otherwise – that the Indicative Values were generally not updated from 4:00 p.m. to at least 6:00 p.m. ET each day and were therefore stale and/or inaccurate, investors like Plaintiff trading XIV in the afterhours had no reason to check on the prices of the VIX futures, from which they potentially could have deduced on February 5, 2018, that the economic value of XIV had collapsed and/or was in the midst of collapsing.

31.     In addition to the omissions in the 2018 Supplement, Plaintiff complains of another material non-disclosure by Credit Suisse.  Specifically, NASDAQ Listing Rule 5250(b)(1) requires issuers listed on the Nasdaq promptly to disclose to the public "any material information that would reasonably be expected to affect the value of its securities or influence investors' decisions." Violating that Rule, Credit Suisse omitted to issue a disclosure at any time on February 5, 2018 warning investors of the catastrophic events which lay immediately ahead and/or which were in the midst of transpiring and/or which had transpired with respect to XIV.

32.     At minimum, the confluence of factors that existed on the afternoon of February 5, 2018 "would reasonably be expected to affect the value" of XIV and "influence investors' decisions."  Given the considerable market capitalizations of XIV and other volatility-linked ETPs by February 5, 2018, and the activity in the stock market that day, including a spike in the VIX Index (from historically low levels), there was a certainty that a liquidity gap in the VIX futures would develop, propelling VIX futures prices skyward and obliterating XIV's value.

33.     Furthermore, because it closely monitored its XIV obligations and rebalancing requirements in real time, Credit Suisse would have known on February 5, 2018 that: (i) XIV's

daily rebalancing required the purchase of in excess of 50,000 VIX futures – an amount exceeding the "position accountability level" of CFE Rule 412A (which was established to "reduce the potential risk of price distortions and market disruptions") – by 3:50 p.m. ET; (ii) XIV's daily rebalancing requirements had jumped to more than 59,000 VIX futures contracts by 4:00 p.m. ET; (iii) a liquidity gap had, in fact, materialized in the VIX futures market – causing XIV's value to decline by more than 80% and entitling Credit Suisse to "effect an Event Acceleration" – by at least 4:10:15 p.m. ET; (iv) XIV's economic value temporarily fell below zero – meaning that Credit Suisse was entitled to mark the Indicative Value at zero "on that day, and all future days …." – at 4:11:00 p.m. ET; and (v) XIV's economic value was just $4.22 at 4:15 p.m. ET.

34.     All of these developments, whether taken individually or together, "would reasonably be expected to affect the value" of XIV and "influence investors' decisions." Thus, under Listing Rule 5250(b)(1), Credit Suisse owed a duty to "make prompt disclosure to the public" of them. At no time on the afternoon of February 5, 2018, however, did Credit Suisse issue any public disclosure as it was required to do. Instead, Credit Suisse remained silent, as investors, including Plaintiff, continued to purchase a security that was imploding.

35.     Moreover, it is apparent that Credit Suisse was able to, and did, predict in advance what would happen to VIX futures after 4:00 p.m. ET on February 5, 2018. This can be inferred from the fact that, *inter alia*, Credit Suisse profited handsomely from its own proprietary trading that day. On April 25, 2018, Credit Suisse reported that it had generated approximately $490 million in revenues for its equity sales and trading division for the fiscal quarter ended March 31, 2018, a 30% increase compared to the previous quarter, stating that the positive results were "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business." It is believed that a substantial portion of those increased revenues stemmed

11

from opportunistic trading by Credit Suisse (*i.e.*, front-running) ahead of XIV's rebalancing on February 5, 2018, which was the only day that fiscal quarter which had "particularly higher levels of volatility …."  Indeed, on May 23, 2018, CNBC reported that Goldman Sachs – which is believed to have been a leading XIV swap counterparty to Credit Suisse – made $200 million in profits trading volatility on February 5, 2018 alone, an amount "on par with what the firm's derivatives unit typically makes in an entire year."

36.    It is thus clear that Credit Suisse was not caught flat-footed or unawares by the liquidity gap in VIX futures on February 5, 2018.  Instead, it anticipated what would happen with a high degree of clarity and positioned its proprietary trades accordingly, generating enormous profits.

37.    Had Credit Suisse issued a Listing Rule 5250(b)(1) disclosure on the afternoon of February 5, 2018, investors like Plaintiff contemplating XIV trades would have been forewarned of the catastrophic events which lay immediately ahead and/or which were in the midst of transpiring and/or which had just occurred.  No reasonable investor, including Plaintiff, would have purchased or held XIV after 4:00 p.m. ET on February 5, 2018, had Credit Suisse issued such a notice as it was obligated to do.

38.    Nevertheless, as a result of Credit Suisse's omission to issue a Rule 5250(b)(1) disclosure, investors, including Plaintiff, believing – correctly – that stock market volatility would recede after the modest spike which had occurred during the regular trading session of the stock market that day, purchased more than $700 million in XIV ETNs after 4 p.m. ET.  Indeed, Plaintiff continued to purchase XIV ETNs as late as 5:38 p.m. ET.  Due to the risks which Credit Suisse omitted to disclose at any time through February 5, 2018, however, the value of those investments was virtually wiped out.

## II.    JURISDICTION AND VENUE

39.    The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k and 77o, and §§9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78i, 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

40.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, and §27 of the Exchange Act.

41.    Venue is proper in this District pursuant to §22 of the 1933 Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in his District. In addition, many of the Credit Suisse reside or transact business in this District, and the securities that are the subject of this complaint traded in this District on the Nasdaq Stock Market ("Nasdaq").

42.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the Nasdaq, a national securities exchange.

## III.    PARTIES

### A.    Plaintiff

43.    Plaintiff is an irrevocable trust formed in the Commonwealth of Pennsylvania on April 30, 2013.  On February 5, 2018, Plaintiff purchased 900,000 XIV notes at prices between $22.21 and $95.38, at a cost of over $43 million, between 3:50 p.m. and 5:38 p.m.  The purchases were initiated in Villanova, Pennsylvania, and were affected via telephone from that location to

the broker-dealers which completed the purchase.  Plaintiff suffered approximately $37.7 million in losses on its XIV investment in under a two-hour period of time.

**B.     Defendants**

44.     Defendant Credit Suisse AG is the primary operating subsidiary of Credit Suisse Group AG, a Swiss multinational financial services holding company with its headquarters in Zurich, Switzerland.  Credit Suisse AG was the issuer of XIV.

45.     Defendant Credit Suisse Securities (USA) LLC ("CSSU") is a United States-based broker-dealer, headquartered in New York, New York, and an affiliate of Credit Suisse AG.  CSSU served as an underwriter and placement and redemption agent for XIV.  CSSU charged a creation fee of up to approximately 0.15% times the closing indicative value of the XIV on the date on which Credit Suisse priced new notes and charged investors a redemption charge of 0.05% times the closing indicative value on any XIV ETNs that were redeemed earlier than the redemption date at the investor's option.

46.     Credit Suisse AG and CSSU are collectively referred to herein as "Credit Suisse".

47.     Defendant Tidjane Thiam ("Thiam") has served as the CEO of Credit Suisse and as a member of the Executive Board at Credit Suisse since 2015.  As part of his duties as CEO, defendant Thiam was a member of the Capital Allocation and Risk Management Committee ("CARMC").

48.     Defendant David R. Mathers ("Mathers") has served as the CFO of Credit Suisse and a member of the Executive Board since 2010.  As part of his duties as CFO, defendant Mathers was a member of the CARMC and the chair of the Valuation Risk Management Committee ("VARMC").

49.     Defendants Thiam and Mathers together are referred to herein as the "Individual Defendants."  The Individual Defendants, in part because of their positions with Credit Suisse,

possessed the power and authority to control the contents of Credit Suisse's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and investors, *i.e.*, the market.  Each Individual Defendant made or controlled the public statements alleged herein to be false or misleading, including in the offering documents and other public statements of Credit Suisse, and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected.

50.     Credit Suisse and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     The XIV ETN

51.     The S&P 500 Index is a capitalization-weighted index that tracks the performance of five hundred large market capitalization companies utilizing the total market value of their outstanding shares.

52.     Put and call options on the S&P 500 Index are financial derivatives created by, and made available to investors on, the CBOE.  Market participants trade the products based upon their belief about the direction in which the S&P 500 Index will move.

53.     In 1993, the CBOE created the "VIX Index," a measurement of the market's expectations of near-term volatility conveyed by the S&P 500 options prices.  The CBOE calculates the VIX Index based on the real-time pricing of S&P 500 put and call option contracts by averaging the weighted prices of such options over an array of strike prices.

54.     Individuals cannot trade the VIX Index, but they can execute trades in VIX futures contracts.  VIX futures contracts are exchange-traded derivative products that were created to allow market participants to trade in implied future volatility of the S&P 500 (as derived from put

and call contracts), based on their assessment and predictions regarding future movements of the VIX Index.

55.     The S&P 500 VIX Short-Term Futures Index (ticker symbol "SPVXSP") (previously defined as the "VIX Short-Term Futures Index"), published by S&P, models the outcome of holding long positions in VIX futures.  The VIX Short-Term Futures Index uses prices of the two nearest-to-expiration monthly VIX futures contracts to replicate a position that rolls the nearest month VIX futures to the next month daily in equal fractional amounts, resulting in a near-constant one-month rolling long position in first and second month VIX futures.  In effect, the VIX Short-Term Futures Index represents the market's prediction as to how investors expect the VIX Index to perform over the subsequent thirty days.

56.     In 2010, VelocityShares created the VelocityShares Daily Inverse VIX Short-Term ETN, which became known by its ticker symbol, "XIV" (the reverse spelling of VIX).  XIV was designed to track the daily inverse performance of the VIX Short-Term Futures Index.  That same year, Credit Suisse acquired the right to issue XIV.

57.     As an ETN, XIV was an unsecured debt instrument traded on the NASDAQ exchange.  Like a traditional promissory note or bond, owners of XIV had the right to redeem their ETNs upon maturity.  But, unlike a traditional promissory note, the amount an XIV investor would receive upon redemption (in other words, XIV's underlying economic value) did not consist of principal with accrued interest.  Rather, XIV's economic value was determined through a formula based on the daily inverse performance of the VIX Short-Term Futures Index.

58.     By the terms of the offering documents, XIV's Calculation Agents calculated and disseminated that economic value in the form of the Indicative Value under the ticker symbol XIVIV.

**B.      Credit Suisse Hedges Its Liabilities in Connection with XIV Using VIX Futures**

59.      Credit Suisse derived income from XIV principally from the fees it collected on the product, while using hedges to neutralize its liabilities in connection therewith.  As disclosed in the 2018 Supplement, Credit Suisse – like other providers of inverse and leveraged volatility-linked ETPs – hedged its obligations with respect to XIV by purchasing and selling securities and financial derivatives, primarily VIX futures.  Specifically, Credit Suisse hedged its XIV obligations by purchasing and selling the two nearest-to-expiration VIX futures contracts used to compute the VIX Short-Term Futures Index, to which XIV was inversely benchmarked. This structure ensured that Credit Suisse would make money irrespective of the direction of how XIV performed.

60.      In simplified terms, the hedge worked as follows:  If volatility declined, the VIX Short-Term Futures Index would fall, causing XIV's economic value to rise, thereby increasing Credit Suisse's obligations to XIV investors.  To offset this liability, Credit Suisse would sell or "short" VIX futures.[4]  That way, as the VIX Short-Term Futures Index declined, Credit Suisse would profit from that decline, offsetting its increased liability.

61.      Conversely, if volatility rose, the VIX Short-Term Futures Index would also rise, causing XIV's economic value to decline, decreasing Credit Suisse's obligations to XIV investors. In this instance, Credit Suisse would do the opposite – namely, buy VIX futures.  Thus, a decline in the XIV would result in Credit Suisse purchasing VIX futures in order to hedge its exposure and insulate itself from market risk, while still making money on investor fees.

---

[4]  "Shorting" a security generally results in a gain to the investor if the price of the security declines within a specified period of time.

62.     Although not disclosed in the XIV offering documents, it is now clear that Credit Suisse (as well as providers of other volatility-linked ETPs) rebalanced their hedge portfolios at around the same time each day – between 4:00 p.m. (when the regular trading session of the stock market closed) and 4:15 p.m. ET (when the VIX futures market closed).

63.     Credit Suisse's daily rebalance involved purchasing or selling VIX futures to account for the day's price change in the VIX Short-Term Futures Index, any changes in the constituents and/or the constituent weights of the VIX Short-Term Futures Index, and any new investment in or disinvestment from XIV.  The sum of these factors determined the correct number of VIX futures contracts that Credit Suisse needed to hold to hedge entirely its exposure to XIV.

64.     Simply put, if the VIX Short-Term Futures Index rose during a trading day, Credit Suisse needed to purchase VIX futures in quantities adequate to rebalance its hedge.  Conversely, if the VIX Short-Term Futures Index fell, Credit Suisse needed to sell VIX futures to match.  Credit Suisse needed to ensure that, each day, it was able to end up with the correct number of VIX futures to hedge entirely its exposure to the ETNs.  Otherwise, Credit Suisse would own a massive unhedged exposure to volatility through those obligations, putting its own capital at risk.

**C.      Volatility Declines to Historically Low Levels while the Volatility-Linked ETP Market Experiences Considerable Growth**

65.     Beginning in early 2017, markets entered a period of historically low volatility.  By May 2017, the VIX Index had closed below 10, less than half its historical average of approximately 20.  Over the course of 2017, volatility remained abnormally low.  According to analysis performed by the investment bank Goldman Sachs, the S&P 500 had a realized volatility score of only 7 during 2017, which "'ranked in the first percentile since 1930.'"  Of the 56 lowest closing levels in the history of the VIX Index since 1990, 47 of them occurred in 2017.

66.     As a result, the VIX Short-Term Futures Index, to which XIV was inversely benchmarked, also declined during 2017, and remained at historically low levels throughout the year.

67.     The historically low market volatility meant that even a relatively modest increase in the absolute level of volatility would cause the VIX Short-Term Futures Index to increase significantly on a percentage basis. This, in turn, would cause a proportionally large decrease in the economic value of XIV.

68.     At the same time, investments in volatility-linked ETPs and other financial instruments used to trade volatility dramatically increased.  Hundreds of millions of dollars' worth of invested capital flowed into volatility-related ETPs, as the number of ETPs tied to volatility increased to nearly 40 such products.  Many of the ETPs were leveraged, with investment objectives that sought to achieve some multiple of the underlying volatility index (generally 2x). Like inverse ETPs such as XIV, leveraged ETPs require daily rebalancing.  Credit Suisse alone issued hundreds of millions of dollars' worth of such products, including the VelocityShares Daily 2x VIX Short-Term ETN (ticker symbol "TVIX") (the "TVIX").

69.     XIV was Credit Suisse's largest volatility-linked ETP, and its market capitalization increased substantially.  When Credit Suisse licensed XIV from VelocityShares in 2010, the product was modestly sized, with a mere $5 million market capitalization.  XIV's market capitalization subsequently grew to $12 million by the end of 2010, $387 million by the end of 2011, $419 million by the end of 2012, $937 million by the end of 2014, $1 billion by the end of 2015, and $1.2 billion by the end of 2017.

70.     On June 30, 2017, Credit Suisse offered an additional 5,000,000 XIV notes on top of the 9,018,880 notes that were already issued and outstanding.  Then, in connection with the

2018 Supplement, Credit Suisse offered an additional 16,275,000 notes on top of the 10,793,880

XIV notes then-outstanding.  The issuance of the additional ETNs, combined with a continued fall

in volatility, led to XIV's market capitalization increasing to approximately $1.9 billion by

February 1, 2018, or 380x its size in 2010.

71.    The market capitalizations of other major inverse and leveraged volatility-linked

ETPs also soared to huge levels.  As of February 2, 2018, the market capitalization of the ProShares

Short VIX Short-Term Futures ETF (ticker symbol "SVXY") was $1.4 billion; that of the

ProShares Ultra VIX Short-Term Futures ETF (ticker symbol "UVXY") was $434 million; and

that of Credit Suisse's TVIX was $350 million.

**D.    The Undisclosed Risk of a VIX Futures Liquidity Gap which Would Devastate XIV**

72.    In the 2018 Supplement, Credit Suisse informed investors in pertinent part that "***we***

***and our affiliates have no reason to believe that our or their hedging activities will have a***

***material impact on the level of the applicable underlying Index ….***"

73.    This statement was repeated verbatim and without qualification from all the prior

pricing supplements that Credit Suisse had issued with respect to XIV back to November 2010.

As of November 2010, the volatility-linked ETP universe was so small that this statement was

true.  By at least January 29, 2018, however, the statement was materially misleading in light of

the omission of what would transpire if volatility suddenly increased, which was inevitable.

74.    Indeed, given the considerable growth which had occurred in the market

capitalizations of inverse and leveraged volatility-linked ETPs (including, primarily, XIV) by at

least that date, as alleged above, there was a material risk that Credit Suisse's hedging activities –

as well as those of other volatility-linked ETP issuers and other traders following similar strategies

– would have a highly material impact on VIX futures in the event of any relatively small increase

in volatility. The aggregate rebalancing requirements of all those products threatened to dwarf the VIX futures market.

75.     Specifically, there was a risk that such a volatility increase would lead to a liquidity gap in VIX futures as Credit Suisse, its swap counterparties, and other providers of volatility-linked ETPs attempted to rebalance their respective hedges in an overcrowded market. The liquidity gap would cause a tremendous feedback loop of buying which would propel VIX futures skyward, causing XIV's value to plummet in a matter of minutes. Further, the risk of a liquidity gap would be heightened during periods of low volatility because at such times – which happened to be the case as of January 29, 2018 – even relatively small absolute increases in volatility would be significant on a percentage basis. Simply put, there were not enough VIX futures contracts available from liquidity providers to absorb the demand of those instruments in such an event without a run on the market. A spike in volatility would cause a disproportionately large move in VIX futures as participants rushed to rebalance their hedges. XIV was thus, by January 29, 2018, a powder-keg primed to explode, and the question was not if it would blow up, but when. The 2018 Supplement, however, omitted to disclose those risks.

76.     The 2018 Supplement also omitted to disclose that inverse volatility-linked ETPs such as XIV were particularly at risk of catastrophic losses in the event of a liquidity gap. Because of the exponential growth of XIV's AUM from 2010 to 2018 by approximately 380x leading up to January 29, 2018, even a small to moderate movement in the S&P would cause a rebalance so large that it risked triggering a feedback loop that would result in a catastrophic implosion of the value of XIV.

77.     Exacerbating the risk of a liquidity gap, XIV was also subject to the risk of front-running by Credit Suisse and other industry participants – *i.e.*, banks, market-makers, specialist

volatility trading firms, and hedge funds – which had access to proprietary market data, insider knowledge about the hedging methodologies used by Credit Suisse, and non-public modelling capabilities, all of which gave them visibility into the XIV's rebalancing needs based on market movements each trading day.  Credit Suisse and its swap counterparties were able to calculate the size of XIV's rebalance and use this information to trade ahead of and front-run XIV's rebalancing transactions daily, from which it is believed they derived substantial profits.  These activities increased the probability of a liquidity gap occurring as well as its severity once one did.

78.    Furthermore, as alleged above, volatility-linked ETP providers, including Credit Suisse, rebalanced their portfolios at around the same time each day – between 4:00 p.m. and 4:15 p.m. ET.  This meant that the Credit Suisse would generally be purchasing VIX futures to rebalance XIV at times when demand for those futures was highest.

79.    By at least January 29, 2018, these undisclosed risks guaranteed XIV's demise, setting the stage for the XIV to suffer a self-destructive feedback loop or "death spiral":  if volatility rose (causing XIV to decline), market participants including Credit Suisse would rush to buy VIX futures, thereby driving up their prices, which would cause XIV's value to decline further. The decline in XIV's value would necessitate that Credit Suisse purchase even more VIX futures – at higher prices – to complete its rebalancing.  This would propel VIX futures up even more, driving XIV's value further down, and so on until XIV collapsed.  Additionally, when such destructive "death spiral" ultimately developed, it would obliterate XIV's value in a matter of minutes.

80.    Notably, while a potential feedback loop between the VIX futures market and the XIV theoretically could work in both directions and push the VIX Short-Term Futures Index down when Credit Suisse sold VIX futures – and thereby the XIV up – large rebalance purchases tend

to have a greater impact on the VIX Short-Term Futures Index than large rebalance sales. This is because implied market volatility is constrained on the downside at zero volatility, while no such constraint exists to the upside. As a result, it tends to take ever increasing selling activity to push the VIX Short-Term Futures Index toward zero, whereas there is no such constraint on its upward movement.

81. Additionally, Credit Suisse created an even more acute risk of a liquidity gap by using VIX futures to hedge its liabilities with respect to not one but two products – XIV and TVIX. This practice heightened the threat of massive rebalancing purchases which would cause an outsized impact on VIX futures prices.

82. Furthermore, by design, the complexity of the XIV concealed and magnified these risks, which were poorly understood even by sophisticated industry participants. Many (if not most) of the investors in the XIV were, like, Plaintiff, unprofessional investors who did not have access to non-public predictive models, sophisticated analytical tools, or the massive amounts of data (which included proprietary and non-public data) necessary to comprehend the true risks of the XIV or how it would perform in stress scenarios.

83. The 2018 Supplement omitted to disclose these factors. Had the pertinent risks been disclosed, no reasonable investor, including Plaintiff, would have purchased or held XIV after 4:00 p.m. ET on any day – and certainly on any day when volatility had increased appreciably.

**E.     Credit Suisse Takes Steps to Protect Itself from the Risk of a VIX Futures Liquidity Gap**

84. Perceiving the risk of and fearing a VIX futures liquidity gap, Credit Suisse took steps to protect itself against that risk. Credit Suisse needed to ensure that, each day, it would be able to obtain the correct number of VIX futures contracts to hedge entirely its ETN obligations,

thereby avoiding ownership of an unhedged exposure to volatility which could threaten its own capital. A liquidity gap in the VIX futures market would jeopardize that ability.

85. Credit Suisse also needed to comply with regulatory requirements, including, *inter alia*, the position limits imposed by CFE Rule 412A. That Rule – which was promulgated to "reduce the potential risk of price distortions and market disruptions"[5] – requires large traders like Credit Suisse to provide notice to the CFE "prior to, or within one Business Day" of exceeding applicable position limits, which, for VIX futures, is 50,000 or more VIX futures contracts. *See* CFE Rule 1202(d). This limit is what is known as a "position accountability" rule for CBOE futures products. The CFE has authority to require traders that exceed position accountability levels to, *inter alia*, "[refrain from] further increase any positions that are above the applicable position accountability levels … reduce any positions that are above the applicable position accountability levels, or … [or] comply with any prospective levels or limits prescribed by the [CFE] which equal or exceed the applicable position accountability levels or the size of the positions controlled by the [trader]".

86. By at least July 1, 2016, it is believed that Credit Suisse grew concerned that a VIX futures liquidity gap would threaten its capital or ability to comply with CFE Rule 412A. And for good reason. Analysis shows that, as of that date, given XIV's size, there was a 99.73% statistical probability that a rebalance requiring the purchase or sale of VIX futures exceeding the 50,000-contract CFE "position accountability level" would occur approximately every 300 trading days (about 14 months). This posed risks which were unacceptable to Credit Suisse.

---

[5] *See* Michael Mollet, *CBOE Futures Exchange, LLC Rule Certification Submission Number CFE-2013-32, CBOE Futures Exchange*, 3 (Sept. 20, 2012) http://cfe.cboe.com/publish/CFErulefilings/SR-CFE-2013-032.pdf.

87.     Therefore, on July 1, 2016, Credit Suisse issued a press release stating that the issuance of additional XIV ETNs would be conditioned on the purchasers' "agreement to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps."  Credit Suisse's press release stated in pertinent part:

> Beginning on July 5, 2016, Credit Suisse may issue additional ETNs on a weekly basis and may condition its acceptance of a counterparty's offer to purchase the ETNs **on its agreement to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps**.

88.     This new policy enabled Credit Suisse to issue additional XIV ETNs, increasing its fee income, while hedging its exposure to those securities via swaps instead of through VIX futures trading.

89.     Indeed, facilitated in part by the swap arrangements, Credit Suisse's fee income in connection with XIV vastly increased.  The Daily Investor Fee collected by Credit Suisse jumped from $500 per day in 2010 to nearly $100,000 per day in February 2018.

90.     Significantly, however, swaps do not eliminate risk but merely transfer it from one party to another.  By requiring counterparties to sell Credit Suisse swaps consistent with Credit Suisse's hedging strategy, Credit Suisse simply transferred its own risk and hedging needs to its swap counterparties.  These swap counterparties were then compelled to purchased and sell the same VIX futures that CS would have – in the absence of the swaps – needed to purchase and sell itself.  Thus, while Credit Suisse protected itself against the risk of a VIX futures liquidity gap, the liquidity-gap risks to which XIV investors were exposed continued to exist, and, in fact, dramatically increased due the expanding float and market capitalization of XIV.

**F.     The Undisclosed Risks Materialize in a "Volpocalypse"**

91.     As alleged above, on January 29, 2018, Credit Suisse issued the 2018 Supplement repeating verbatim and without qualification the statement from earlier pricing supplements for

XIV that "*we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying [VIX Short-Term Futures] Index …*."

92.     Barely a week after issuance of the 2018 Supplement, the risk of a liquidity gap in VIX futures suddenly materialized.  On Monday, February 5, 2018, the S&P 500 Index fell 4% amid concerns about rising bond yields and higher inflation.  On a historical basis, the decline was unremarkable.  Percentagewise, it was less than half the greatest single-day decline in the S&P 500 Index over the last 30 years (a 9% decline that occurred on October 15, 2008) and a fraction of the 20% decline in the S&P 500 Index that occurred on October 19, 1987.  By the close of regular trading at 4:00 p.m. ET, the VIX Short-Term Futures Index had risen 33%, from a prior daily settlement value of 49.43 to 65.75.  As expected, XIV's Indicative Value fell an equivalent 33%, from a prior daily close of $108.37 to $72.59 as of 4:00 p.m. ET on February 5, 2018.  Trading was orderly and positions in the stock, equity options, and VIX futures markets remained liquid.

93.     However, between 4:00 p.m. and 4:15 p.m. ET, as Credit Suisse, its swap counterparties, and other providers of volatility-linked ETPs rebalanced their hedges in an overly crowded VIX futures market, that market spiraled out of control.  The prices of VIX futures rose, which in turn drove down XIV's value, resulting in a feedback loop which required the purchase of yet more VIX futures by Credit Suisse, its swap counterparties, and other providers of volatility-linked ETPs, causing XIV's value to decline further, and so forth.  The undisclosed peril of a "death spiral" ensued.

94.     Between 4:00 p.m. and 4:15 p.m. ET on February 5, 2018, the prices of the VIX futures making up the VIX Short-Term Futures Index rocketed to $29.81 – a total increase of 96%

over the settlement price of the prior trading day, February 2, 2018.  Figure 1 below illustrates the

dramatic rise in price of the VIX March futures contracts which formed part of the VIX Short-

Term Volatility Index that day:



95.     Rebalancing XIV on February 5, 2018 required the purchase of 104,700 VIX

futures contracts – an amount equal to 41% of the total volume of contracts traded during the

period 4:00 p.m. to 4:15 p.m. ET (which was 253,687 VIX futures).  Notably, this quantity was

multiples larger than the 50,000-contract "position accountability" level of CFE Rule 412A, which,

as alleged above, was promulgated to "reduce the potential risk of price distortions and market

disruptions".

96.     As a result, XIV's economic value plummeted.

97.     By at least 4:10:15 p.m. ET on February 5, 2018, XIV's economic value had fallen

more than 80%, entitling Credit Suisse to "effect an Event Acceleration".  Furthermore, at 4:11:00

27

p.m. ET, XIV's economic value temporarily fell below zero, meaning that Credit Suisse was entitled to mark the Indicative Value at zero "on that day, and all future days ....".

98.    By the time the "death spiral" concluded, XIV – which had opened at an Indicative Value of $103 that morning – was worth $4.22.  In total that day, XIV investors lost over $1.56 billion – 96% of XIV's total value.

99.    Significantly, the collapse in XIV's value occurred after the equities market had closed its trading session, and was, therefore, largely if not completely unrelated to changes in equity market value or volatility, or any other market-wide phenomenon.  Indeed, in afterhours trading from 4:00 p.m. to 4:15 p.m. ET on February 5, 2018, the VIX Index rose just 13%, from 32.98 to 37.32.  Rather, the collapse in XIV's value during that time period was due to the undisclosed material risks inherent in the rebalancing requirements of XIV, given what was, by at least January 29, 2018, a VIX futures market that was insufficiently liquid to handle those requirements without a disproportionate impact on VIX futures prices.

100.    Media commentators described the shocking and complete collapse of the XIV in suitably cataclysmic terms such as "Armageddon" and the "Volpocalypse."  Others noted that investors had been "blindsided" as latent risks in XIV materialized.

101.    On February 6, 2018, trading in XIV was temporarily halted by market regulators.  That same day, Credit Suisse announced that the decline in XIV had triggered an "acceleration event" under the terms of the Registration Statement, allowing Credit Suisse to force redemption of the ETNs.  The release stated that XIV ETNs would be valued as of the closing indicative value on February 15, 2018 and redeemed at this valuation on February 21, 2018.  Investors would ultimately receive only $5.99 for each XIV ETN.

102.    Adding further insult to injury, on February 6, 2018, Credit Suisse issued a press release proclaiming that it had "experienced no trading losses" from the collapse of XIV.  Credit Suisse would later state that it had "completely hedged" its XIV exposure by "trading VIX futures."

### G.    The Inaccuracy of the Indicative Value after 4:00 p.m. ET

103.    Aside from the threat of a liquidity gap in VIX futures, the 2018 Supplement omitted to disclose an additional material risk relating to XIV – namely, that the Indicative Value disseminated by XIV's Calculation Agents generally was not updated and was therefore inaccurate from 4:00 p.m. to at least 6:00 p.m. ET each trading day.  This, despite that the VIX futures market was open for trading – and that real-time VIX futures prices were therefore available – for all but 15 minutes of that time period.[6]

104.    As alleged above, XIV's economic value was determined through a formula based on the daily inverse performance of the VIX Short-Term Futures Index.  XIV's Calculation Agents calculated and disseminated that value in the form of XIV's Indicative Value under the ticker symbol XIVIV.

105.    The level of the Indicative Value was highly material to VIX investors. Dissemination of the Indicative Value was intended to allow investors to determine whether XIV was trading at a premium or discount to its economic value.  Upon maturity, redemption, or acceleration of the ETNs, Credit Suisse was obligated to pay investors based on the Indicative Value.

---

[6]  The regular trading session for VIX futures ends at 4:15 p.m. ET.  After a 15-minute break, the VIX futures market reopens at 4:30 p.m. ET for Extended Hours trading, which is the start of the next business day for VIX futures transactions.

106.    The Registration Statement informed investors that the Indicative Value was "designed to approximate the economic value of [XIV] at a given time" and that such value was based upon S&P's VIX Short-Term Futures Index, which it stated "is calculated in real time ... applying real time prices of the relevant VIX futures contracts."   Furthermore, the 2018 Supplement stated that the Indicative Value "will be calculated every 15 seconds on each Index Business Day …."

107.    The Registration Statement also contained important stipulations relating to the Indicative Value.  It provided that "[i]f the Intraday Indicative Value is equal to or less than zero at any time … the Closing Indicative Value on that day, and all future days, will be zero and you will lose all of your investment in [XIV]."   The Registration Statement also stated that Credit Suisse had the right to "effect an Event Acceleration" – i.e., to compel investors to redeem their ETNs – if the Indicative Value dropped 80% or more in a day.  If Credit Suisse exercised this right, investors would be paid based on the Indicative Value.

108.    Nevertheless, unbeknownst to investors, including Plaintiff, S&P, which published the VIX Short-Term Futures Index (which was used by the Calculation Agents to compute the Indicative Value), inexplicably did not update that index from 4:00 p.m. to at least 6:00 p.m. ET on any trading day for at least the four years prior to February 5, 2018.  Instead, S&P published stale and/or inaccurate values during those time periods.  As a result, the Indicative Value was therefore also generally stale and/or inaccurate at those times.

109.    This fact is confirmed through analysis comparing the Indicative Value (as disseminated by the Calculation Agents) on February 5, 2018 versus XIV's economic value (as derived from the prices of the VIX futures contracts underlying the VIX Short-Term Futures Index), as depicted in Figure 2 below.



110.   This is further confirmed by an email exchange between Plaintiff and S&P dated April 4-5, 2018.  In the exchange, S&P admitted to Plaintiff that the VIX Short-Term Futures Index values regularly were not updated after 4:00 p.m. ET.  S&P informed Plaintiff that it would correct this error in its data feed by the next business day and that the VIX Short-Term Futures Index would begin tracking movements in VIX futures after 4:00 p.m. ET.

111.   Prior to February 5, 2018, the inaccuracy of the Indicative Value from 4:00 p.m. to at least 6:00 p.m. ET was immaterial given that volatility generally was stable after 4:00 p.m. ET, when the regular trading session for stocks closed.

31

112.    However, on February 5, 2018, unbeknownst to investors in XIV, the Indicative

Value was overstated materially, obscuring XIV's instability.  VIX futures prices skyrocketed, yet

because of the failure of the S&P data feed for the VIX Short-Term Futures Index to update, those

price changes did not show up in the Indicative Value.  Instead, the Indicative Value remained

relatively constant at around $25 for 55 minutes, as XIV's economic value plummeted.

113.    Indeed, the Indicative Value was overstated by nearly 500% during this time period.

114.    Notably, by at least 4:10:15 p.m. ET, XIV's economic value had fallen more than

80%, entitling Credit Suisse to "effect an Event Acceleration".  Furthermore, at 4:11:00 p.m. ET,

XIV's economic value temporarily fell below zero, meaning that Credit Suisse was entitled to

mark the Indicative Value at zero "on that day, and all future days ….".  Yet, investors had no

reason to suppose that these critical thresholds had been breached.  Indeed, at those times, the

Indicative Value printed at $27.09.  This represented a daily decline of only 77%, which was short

of the 80% threshold required for Credit Suisse to declare an "Event Acceleration".

115.    At 5:09 p.m. ET, the Indicative Value finally updated at $4.22, stunning investors.

XIV's market trading price swiftly declined.

116.    Given the inaccuracy of the Indicative Value, investors like Plaintiff which traded

XIV after 4:00 p.m. ET on February 5, 2018 had no way of knowing that anything was amiss with

XIV, much less that the prices of VIX futures had skyrocketed after the close of the regular trading

session of the stock market, triggering a "death spiral" feedback loop which was wiping out XIV's

economic value.  To the contrary, market trading in the XIV seemed normal.

117.    Further, given Credit Suisse's omission to disclose in the offering documents – or

otherwise – that the Indicative Values were generally not updated from 4:00 p.m. to at least 6:00

p.m. ET each day and were therefore stale and/or inaccurate, investors like Plaintiff trading XIV

in the afterhours had no reason to check on the prices of the VIX futures, from which they potentially could have deduced on February 5, 2018, that the economic value of XIV had collapsed and/or was in the midst of a collapse and/or had collapsed.

**H.    Credit Suisse Omits to Issue a NASDAQ Listing Rule 5250(b)(1) Disclosure**

118.    In addition to the omissions in the 2018 Supplement, Plaintiff complains of another material non-disclosure by Credit Suisse.   Specifically, NASDAQ Listing Rule 5250(b)(1) provides that issuers listed on the Nasdaq "shall make prompt disclosure to the public … of any material information that would reasonably be expected to affect the value of its securities or influence investors' decisions."  Violating this disclosure obligation, Credit Suisse omitted to issue a disclosure at any time on February 5, 2018 warning investors of the catastrophic events which lay immediately ahead and/or which were in the midst of transpiring and/or which had transpired with respect to XIV.

119.    At minimum, the confluence of factors that existed on the afternoon of February 5, 2018 "would reasonably be expected to affect the value" of XIV and "influence investors' decisions."  Given the considerable market capitalizations of XIV and other volatility-linked ETPs by February 5, 2018, and the activity in the stock market that day, including the spike in volatility (from historically low levels), there was a certainty that a liquidity gap in the VIX futures would develop, propelling VIX futures prices skyward and obliterating XIV's value.

120.    Further, as alleged above, Credit Suisse monitored its ETN obligations and rebalancing requirements, including specifically those for XIV, in real time both to protect its own capital and to comply with CFE position limits and other regulatory requirements.  To do so, Credit Suisse tracked the real-time prices of the VIX futures contracts used to compute the VIX Short-Term Futures Index (to which XIV was inversely benchmarked), rather than relying on the Index values disseminated by S&P.  Indeed, given the massive liabilities at stake and the potential for

impairment to the firm's capital, Credit Suisse needed to monitor its XIV obligations and rebalancing requirements on at least a millisecond basis, while the VIX Short-Term Futures Index was updated only every 15 seconds (a relative eternity) – and was not updated at all after 4:00 p.m. ET. As a large financial institution, Credit Suisse would not have relied on a third-party for such vital information when that information was accessible in real-time from an original source as the VIX futures prices were.

121. Based on its real-time monitoring of its ETN obligations and rebalancing requirements, analysis indicates that Credit Suisse would have known by 3:50 p.m. ET on February 5, 2018, that XIV's daily rebalancing would require the purchase of in excess of 50,000 VIX futures – an amount exceeding the "position accountability level" of CFE Rule 412A, which, as alleged above, was established to "reduce the potential risk of price distortions and market disruptions". Notably, Rule 412A requires large traders like Credit Suisse to notify the CFE if they exceed or expect to exceed position accountability levels. It is believed that Credit Suisse provided the requisite Rule 412A notice to the CFE – or, at minimum, concluded that such a notice was required – by at least 3:50 p.m. ET on February 5, 2018, given what Credit Suisse would have known about XIV's rebalancing requirements by that time on that day. Yet, Credit Suisse omitted to issue any notice to the general public about this material development.

122. The situation grew increasingly dire as the afternoon progressed. Based on its real-time monitoring of its ETN obligations and rebalancing requirements, analysis indicates that Credit Suisse would have known that: (i) XIV's daily rebalancing requirements had jumped from at least 50,000 VIX futures contracts by 3:50 p.m. ET to more than 59,000 VIX futures contracts by 4:00 p.m. ET; (ii) a liquidity gap had, in fact, materialized in the VIX futures market – causing XIV's value to decline by more than 80% and entitling Credit Suisse to "effect an Event Acceleration" –

34

by at least 4:10:15 p.m. ET; (iii) XIV's economic value temporarily fell below zero – meaning that Credit Suisse was entitled to mark the Indicative Value at zero "on that day, and all future days …." – at 4:11:00 p.m. ET; and (iv) XIV's economic value was just $4.22 at 4:15 p.m. ET.

123.    Indeed, Credit Suisse certainly would have known that XIV's economic value was just $4.22 by 4:15 p.m. ET on February 5, 2018, because it needed to determine the likely daily settlement prices of the VIX futures contracts that make up the VIX Short-Term Futures Index in order precisely to determine its rebalancing requirements for the day.  Credit Suisse thus would have seen that those VIX futures prices had risen by 96.1% from the prior daily settlement, which meant that XIV had fallen by the same percentage and was worth just $4.22.

124.    All of these developments "would reasonably be expected to affect the value" of XIV and "influence investors' decisions."  Thus, under Listing Rule 5250(b)(1), Credit Suisse owed a duty to "make prompt disclosure to the public" of them.  At no time on the afternoon of February 5, 2018, however, did Credit Suisse issue any public disclosure as it was required to do. Instead, Credit Suisse remained silent, as investors, including Plaintiff, continued to purchase a security that was imploding.

125.    Notably, IM-5250-1 makes clear that Listing Rule 5250(b)(1) was specifically designed to alert the public to emergent news or developments requiring immediate disclosure, including, for example, defaults, tender offers, bankruptcy filings, cancellations of material contracts or orders, resignations or terminations of key personnel, and the like.  For this reason, the Nasdaq MarketWatch department requires that issuers give it only 10 minutes prior notice before issuing a Listing Rule 5250(b)(1) disclosure.  The disaster impending and/or materializing and/or which had materialized for XIV investors on the afternoon of February 5, 2018, was precisely the sort of development for which that Listing Rule 5250(b)(1) was intended.

126.    Moreover, it is apparent that Credit Suisse was able to, and did, predict in advance what would happen to VIX futures after 4:00 p.m. ET on February 5, 2018, and was cognizant of those events as they unfolded.  This can be inferred from the fact that, *inter alia*, Credit Suisse profited handsomely from its own proprietary trading that day.  As alleged above, on April 25, 2018, Credit Suisse reported that it had generated approximately $490 million in revenues for its equity sales and trading division for the fiscal quarter ended March 31, 2018, a 30% increase compared to the previous quarter, stating that the positive results were "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business."  It is believed that a substantial portion of those increased revenues stemmed from opportunistic trading (*i.e.*, front-running) by Credit Suisse ahead of XIV's rebalancing on February 5, 2018, which was the only day that fiscal quarter which had "particularly higher levels of volatility …."  Indeed, on May 23, 2018, CNBC reported that Goldman Sachs – which is believed to have been a leading XIV swap counterparty to Credit Suisse – made $200 million in profits trading volatility on February 5, 2018 alone, an amount "on par with what the firm's derivatives unit typically makes in an entire year."

127.    It is thus clear that Credit Suisse was not caught flat-footed or unawares by the liquidity gap in VIX futures after 4:00 p.m. ET on February 5, 2018.  Instead, it anticipated what would happen with a high degree of clarity and positioned its proprietary trades accordingly, generating enormous profits.  Yet Credit Suisse omitted to issue a disclosure alerting investors to the imminent calamity about to unfold and/or which was in the process of unfolding and/or which had unfolded with respect to XIV at any time on February 5, 2018.

128.    Had Credit Suisse issued a Listing Rule 5250(b)(1) disclosure on the afternoon of February 5, 2018, investors like Plaintiff contemplating XIV trades would have been forewarned

of the catastrophic events which lay immediately ahead and/or which were in the midst of transpiring and/or which had just occurred. No reasonable investor, including Plaintiff, would have purchased or held XIV near or after 4:00 p.m. ET on February 5, 2018, had Credit Suisse issued such a notice as it was obligated to do.

129.     Nevertheless, as a result of Credit Suisse's omission to issue a Rule 5250(b)(1) disclosure, investors, including Plaintiff, believing – correctly – that stock market volatility would recede after the modest spike which had occurred during the regular trading session of the stock market that day, purchased more than $700 million in XIV ETNs after 4 p.m. ET. Indeed, Plaintiff continued to purchase XIV ETNs as late as 5:38 p.m. ET. Due to the risks which Credit Suisse omitted to disclose at any time through February 5, 2018, however, the value of those investments was virtually wiped out.

     **I.**     **Plaintiff's XIV Transactions and Losses**

130.     On February 5, 2018, Plaintiff purchased 900,000 XIV ETNs at prices between $22.21 and $95.38, at a cost of $43,034,153.87, between 3:50 p.m. and 5:38 p.m. ET. Plaintiff made those purchases as part of an investment strategy to reflect its view that the volatility that the stock market had experienced that day would be short-lived and would diminish the following day. Plaintiff was 100% correct in this view. The VIX Index fell 19.7% from a close of 37.32 on February 5, 2018, to a close of 22.42 on February 6, 2018.

131.     Nevertheless, Plaintiff did not profit, but instead suffered tens of millions of dollars in losses, from his XIV investments, as a result of the material undisclosed risks complained of herein. Specifically, Plaintiff sold or was compelled to redeem its XIV ETNs (at a redemption price of only $5.99) for an aggregate of only $5,298,043.91. Plaintiff therefore lost approximately $37.7 million from its XIV investments.

V.    **DEFENDANTS' OMISSIONS**

132.    As alleged above, the offering documents for XIV consisted of a registration statement on Form F-3 filed with the SEC on June 8, 2017, which was subsequently amended, including by means of a prospectus supplement for the offer and sale of XIV ETNs filed with the SEC on January 29, 2018, on Form 424B2 (previously defined as the "2018 Supplement"), which was incorporated into and formed part of the registration statement (previously defined as the "Registration Statement").

133.    The Registration Statement omitted material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

134.    The 2018 Supplement warned investors of "**Long Holding Period Risk**," stating in pertinent part:

> The ETNs … are intended to be trading tools for sophisticated investors to manage *daily trading risks*. *They are designed to achieve their stated investment objectives on a daily basis*, but their performance over longer periods of time can differ significantly from their stated daily objectives. The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for *longer than one day*. Investors should actively and frequently monitor their investments in the ETNs, *even intra-day*.

135.    The 2018 Supplement additionally warned investors that "**The long term expected value of your ETNs is zero.** If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment."

136.    The 2018 Supplement went on to describe XIV as an appropriate vehicle for short-term investment objectives, stating in pertinent part:

> The ETNs may be a suitable investment for you if ….
>
> • You are a sophisticated investor seeking to manage *daily trading risk using a short-term investment*, and are knowledgeable and understand the potential

38

consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.

- You believe the level of the applicable underlying Index will increase … or decline (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment *during the time you hold the ETNs*.

***

- You are a sophisticated investor using the ETNs *to manage daily trading risks* and you understand that the ETNs are designed to achieve their stated investment objectives *on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives*.

137.   The statements from the 2018 Supplement ¶¶ 133-36 above omitted to state material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, for at least the following reasons: (i) by at least January 29, 2018, XIV was inappropriate for even daily or short-term – and not just "long-term" – trading, as it was subject to a high likelihood of catastrophic losses in a matter of minutes and faced the threat of collapse if there was any relatively small increase in volatility, as alleged above in ¶¶ 5-7, 65-83; and (ii) thus, even investors like Plaintiff which did not plan to hold XIV for longer than one day and who monitored their portfolios regularly risked loss of a "substantial portion of your investment" because the short-term – and not just the "long term" – expected value of XIV was also "zero" on any day where volatility increased appreciably, as alleged above in ¶¶ 5-7, 65-83.   The 2018 Supplement misleadingly omitted to disclose these material facts.

138.   The 2018 Supplement also stated in pertinent part:

SUPPLEMENTAL USE OF PROCEEDS AND HEDGING

We intend to use the net proceeds from this offering for our general corporate purposes, which may include the refinancing of our existing indebtedness outside

39

Switzerland. We may also use some or all of the net proceeds from this offering to hedge our obligations under the ETNs of the applicable series.  One or more of our affiliates before and following the issuance of the ETNs of any series may acquire or dispose of the futures contracts underlying the applicable Index, or listed or over-the-counter options contracts in, or other derivatives or synthetic instruments related to, the applicable underlying Index or the S&P 500® Index or the VIX Index to hedge our obligations under the ETNs of such series. In the course of pursuing such a hedging strategy, the price at which such positions may be acquired or disposed of may be a factor in determining the levels of the applicable underlying Index. Although *we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index*, there can be no assurance that the level of the applicable underlying Index will not be affected.

139.    The statements from the 2018 Supplement set forth in the foregoing paragraph omitted to state material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, for at least the following reasons: (i) by at least January 29, 2018, XIV was subject to a high likelihood of catastrophic losses in a matter of minutes and faced the threat of collapse if there was any relatively small increase in stock market volatility, as alleged above in ¶¶ 5-7, 65-83; and (ii) given the considerable growth which had occurred in the market capitalizations of inverse and leveraged volatility-linked ETPs (including, primarily, XIV) by January 29, 2018, there was a material risk that Credit Suisse's hedging activities – as well as those of other volatility-linked ETP issuers and other traders – would have a highly material impact on VIX futures (and, thus, on the VIX Short-Term Futures Index) in the event of any relatively small increase in volatility, as alleged above in ¶¶ 5-7, 65-83.  The 2018 Supplement misleadingly omitted to disclose these material facts.

140.    The 2018 Supplement also stated in relevant part:

We expect to hedge our obligations under the ETNs through one or more of our affiliates.  *This hedging activity will likely involve purchases or sales of* … *swaps* … related to the VIX Index (including the VIX futures contracts which are used to calculate the Indices), the S&P 500® Index (including the put and call options used to calculate the level of the VIX Index) and the equity securities underlying the S&P 500® Index.

141.    The statements from the 2018 Supplement set forth in the foregoing paragraph omitted to state material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, for at least the following reasons: (i) Credit Suisse hedged using swaps to reduce its exposure to a VIX futures liquidity gap, which was certain to occur, and thereby to protect its own capital, which would otherwise be at risk, and to comply with the "position accountability" levels of CFE Rule 412A, which "was promulgated to "reduce the potential risk of price distortions and market disruptions", as alleged above in ¶¶ 13-15, 84-90; and (ii) Credit Suisse's use of swaps to hedge its exposure and thereby issue additional XIV ETNs, combined with the hedging activities of other volatility-linked ETP issuers, increased the risks of a VIX futures liquidity gap to which XIV investors were exposed, as alleged above in ¶¶15, 90.  The 2018 Supplement misleadingly omitted to disclose these material facts.

142.    The 2018 Supplement additionally stated in relevant part:

*Intraday Indicative Value*

The "**Intraday Indicative Value**" for each series of ETNs is ***designed to reflect the economic value of such series of ETNs at a given time***.  It is calculated using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time.  ***The Intraday Indicative Value of each series of ETNs will be calculated every 15 seconds on each Index Business Day*** during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor, and will be published under the applicable Indicative Value ticker for such series of ETNs, as set forth on the cover of this pricing supplement.  **If the Intraday Indicative Value is equal to or less than zero at any time or the Closing Indicative Value is equal to zero on any Index Business Day, the Closing Indicative Value on that day, and all future days, will be zero.**

143.    The 2018 Supplement also stated:

The "Intraday Indicative Value" for each series of ETNs is designed to approximate the economic value of such series of ETNs at a given time.  It is calculated using

the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time.  The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day[7] during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor. If the Intraday Indicative Value is equal to or less than zero at any time or the Closing Indicative Value is equal to zero on any Index Business Day, the Closing Indicative Value on that day, and all future days, will be zero.  See "Description of the ETNs – Intraday Indicative Value" in this pricing supplement. JIC or its affiliate is responsible for computing and disseminating the Intraday Indicative Value.

The Intraday Indicative Value is a calculated value and is not the same as the trading price of the ETNs and is not a price at which you can buy or sell the ETNs in the secondary market. The Intraday Indicative Value does not take into account the factors that influence the trading price of the ETNs, such as imbalances of supply and demand, lack of liquidity and credit considerations.  **The actual trading price of the ETNs in the secondary market may vary significantly from their Intraday Indicative Value.**

***Investors can compare the trading price of the ETNs (if such concurrent price is available) against the Intraday Indicative Value to determine whether the ETNs are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time***.  Investors are cautioned that paying a premium purchase price over the Intraday Indicative Value at any time could lead to the loss of any premium in the event the investor sells the ETNs when the premium is no longer present in the marketplace or when the ETNs are accelerated (including at our option, which we have the discretion to do at any time).  It is also possible that the ETNs will trade in the secondary market at a discount below the Intraday Indicative Value and that investors would receive less than the Intraday Indicative Value if they had to sell their ETNs in the market at such time.

144.    The 2018 Supplement stated with respect to the VIX Short-Term Futures Index:

The level of each Index is calculated in accordance with the method described below.  The value of each Index ***will be published by Bloomberg in real time*** and after the close of trading on each Index Business Day ....

***The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day using the same methodology as for***

---

7   An "Index Business Day" is defined as "a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on [the New York Stock Exchange]."

*calculation of the closing level but applying real time prices of the relevant VIX futures contracts*.

145.     The statements from the 2018 Supplement set forth in ¶¶ 142-44 above omitted to state material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, for at least the following reasons: (i) XIV's Indicative Value generally was not updated and was therefore inaccurate from 4:00 p.m. to at least 6:00 p.m. ET each trading day, despite that the VIX futures market was open for trading – and that real-time VIX futures prices were therefore available – for all but 15 minutes of that time period, as alleged above in ¶¶ 23-32, 103-17; (ii) this was because S&P, which published the VIX Short-Term Futures Index (which the Calculation Agents used to compute the Indicative Value), did not update that index from 4:00 p.m. to at least 6:00 p.m. ET daily, but, instead, published stale and/or inaccurate values, as alleged above in ¶¶ 23-32, 103-17; and (iii) as a result, for such daily time period, the VIX Short-Term Futures Index was not based on "real time prices of the relevant VIX futures contracts" and the Indicative Value was not useful for "comparing against" the market prices of XIV "to determine whether the ETNs are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time", as alleged in ¶¶ 23-32, 103-17.  The 2018 Supplement misleadingly omitted to disclose these material facts.

146.     The 2018 Supplement additionally provided numerous "hypothetical examples" to "show how the ETNs would perform in hypothetical circumstances" and "illustrate the effect that different factors may have on the Maturity Redemption Amount."  The 2018 Supplement provided four hypothetical scenarios, each of which reinforced the misleading impression that the XIV was subject to risks within the range of ordinary trading risks.  The hypotheticals showed annualized XIV returns as high as 124.44%, while the worst-case scenario illustrated a loss of 85.84%

43

annualized over the course of one year.  These examples were materially misleading because nowhere did the 2018 Supplement disclose that the XIV could lose almost the entirety of its value in a matter of minutes for the reasons alleged above in ¶¶ 5-7, 65-90.

147.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  The failure of the 2018 Supplement to disclose any of the adverse facts alleged above in ¶¶ 5-7, 65-90, and 103-17, which made the XIV's collapse inevitable, violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed risks were knowable and known to Credit Suisse and would (and did) have an unfavorable impact on the XIV's continuing operations.  This failure also violated 17 C.F.R. §229.503(c), because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that, as of at least January 29, 2018, made an investment in XIV so speculative or risky in afterhours trading that no reasonable investor would have purchased or held XIV at those times.

148.    In addition to the omissions in the 2018 Supplement, Plaintiff complains of another material non-disclosure by Credit Suisse.  Specifically, NASDAQ Listing Rule 5250(b)(1) provides that issuers listed on the Nasdaq "shall make prompt disclosure to the public … of any material information that would reasonably be expected to affect the value of its securities or influence investors' decisions."  Violating that Rule, Credit Suisse omitted to issue a disclosure at

any time on February 5, 2018 warning investors of the catastrophic events which lay immediately ahead and/or which were in the midst of transpiring and/or which had transpired with respect to XIV, as alleged in ¶¶ 118-29.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Credit Suisse's Active Involvement in the VIX Futures Market

149.    The circumstances give rise to a strong inference that, at all relevant times, and at least by January 29, 2018, Credit Suisse knew about or recklessly disregarded the risk of a liquidity-gap in VIX futures which would devastate XIV.  As alleged above, Credit Suisse had unique insider visibility into the VIX futures market as the issuer of some of the largest volatility-linked ETPs then available – not just XIV but also the TVIX (2x long VIX short-term) and the TVIZ (2x long VIX medium-term).  Credit Suisse was also a major participant in the volatility markets as a market-maker and a trader for its own account.  As Credit Suisse admitted in the 2018 Supplement, "[w]e expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures … and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing."  It also admitted in the 2018 Supplement that "[w]e, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures … for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers."  It also admitted that its hedging activities in VIX futures would be so pervasive that they could "adversely affect the level of the applicable underlying Index – directly or indirectly by affecting the price of the underlying futures".

150.    As a large, sophisticated trader in the VIX futures market, Credit Suisse was intimately familiar with, and tracked, analyzed and modeled, inter alia, the volume and open interest in the VIX futures market, the slippage encountered by traders therein, and other factors

that would affect that market's liquidity and Credit Suisse's ability to hedge and trade.  Simply put, Credit Suisse therefore well knew that, given the given the considerable growth which had occurred in the market capitalizations of XIV and other volatility-linked ETPs by that time, there were not enough VIX futures contracts available from liquidity providers to absorb their rebalancing requirements in the event of even any relatively small increase in the volatility without a run on the market.  Indeed, this fact was common knowledge among industry professionals involved in the volatility markets by at least January 29, 2018.

151.    Credit Suisse also closely monitored its rebalancing requirements and ETN obligations, including specifically those for XIV, in real time both to protect its own capital and to comply with regulatory requirements.  Credit Suisse needed to ensure that, each day, it would be able to obtain the correct number of VIX futures to hedge entirely its exposure to the ETNs. Otherwise, Credit Suisse would be left owning an unauthorized unhedged exposure to volatility through those obligations, threatening its own firm's capital.

152.    Credit Suisse also had to comply with, and to monitor its compliance with, *inter alia*, CFE Rule 412A, which requires large traders like Credit Suisse to notify the CFE if they hold or expect to hold 50,000 or more VIX futures contracts.  Notably, as alleged above, this 50,000-contract "position accountability level" was set by the CFE to "reduce the potential risk of price distortions and market disruptions".

153.    Moreover, in calculating and monitoring its XIV obligations and rebalancing requirements, Credit Suisse tracked the real-time prices of the VIX futures contracts that were used to compute the VIX Short-Term Futures Index (to which XIV was inversely benchmarked), rather than relying on the Index values disseminated by S&P.  Indeed, given the massive liabilities at stake and the potential for impairment to the firm's capital, Credit Suisse would have monitored

its XIV obligations and rebalancing requirements on at least a millisecond basis and not relied on

the VIX Short-Term Futures Index, which was updated only every 15 seconds (a relative eternity)

and not updated at all after 4:00 p.m. ET.  Furthermore, asa large financial institution, Credit Suisse

would not have relied on a third-party for vital information when that information was accessible

in real-time from an original source as the VIX futures prices were.

154.    Furthermore, fearing a liquidity gap, Credit Suisse took steps to protect itself

against that risk.  Specifically, on July 1, 2016, Credit Suisse began conditioning the issuance of

additional XIV ETNs on the purchasers' "agreement to sell to Credit Suisse certain hedging

instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps."

155.    Credit Suisse adopted this policy because, by July 1, 2016, it would have known

that there was a 99.73% statistical probability that XIV's rebalancing requirements would require

the purchase or sale of VIX futures contracts exceeding the 50,000-contract CFE "position

accountability level" approximately every 300 trading days.  This posed an unacceptable risk to

Credit Suisse.  The swap policy enabled Credit Suisse to issue additional ETNs while hedging its

exposure to those securities via swaps instead of through trading VIX futures.

156.    As alleged above, however, as a sophisticated institutional trader, Credit Suisse

well knew that swaps do not eliminate risk but merely transfer it from one party to another.  Credit

Suisse thus would have known that it transferred the same risks that it had to its swap

counterparties, and that those swap counterparties therefore were required to purchase and sell

VIX futures in order to hedge their exposures on the swaps just as Credit Suisse would have had

to purchase and sell VIX futures to hedge its exposure on the relevant XIV ETNs absent the swaps.

Thus, while Credit Suisse protected itself against the risk of a VIX futures liquidity gap, Credit

Suisse would have known or recklessly disregarded that the liquidity-gap risks to which XIV

investors were exposed continued to exist, and, in fact, dramatically increased due the expanding float and market capitalization of XIV.

157.    Moreover, it is apparent that Credit Suisse was able to, and did, predict in advance what would happen to VIX futures after 4:00 p.m. ET on February 5, 2018.  This can be inferred from the fact that, *inter alia*, Credit Suisse profited handsomely from its own proprietary trading that day.  As alleged above, on April 25, 2018, Credit Suisse reported that it had generated approximately $490 million in revenues for its equity sales and trading division for the fiscal quarter ended March 31, 2018, a 30% increase compared to the previous quarter, stating that the positive results were "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business." This represented a major turnaround for Credit Suisse's equity sales and trading division, which had posted a 19% decrease in revenues for fiscal 2017.  It is believed that a substantial portion of the increased revenues for Credit Suisse's fiscal quarter ended March 31, 2018, stemmed from opportunistic trading (*i.e.*, front-running) by Credit Suisse ahead of XIV's rebalancing on February 5, 2018, which was the only day that fiscal quarter which had "particularly higher levels of volatility …."  Indeed, on May 23, 2018, CNBC reported that Goldman Sachs – which is believed to have been a leading XIV swap counterparty to Credit Suisse – made $200 million in profits trading volatility on February 5, 2018 alone, an amount "on par with what the firm's derivatives unit typically makes in an entire year."

158.    Thus, it is apparent that Credit Suisse was not caught flat-footed or unawares by the VIX futures liquidity gap that occurred after 4:00 p.m. ET on February 5, 2018.  Instead, Credit Suisse anticipated that event with a high degree of clarity and positioned its proprietary trades accordingly, generating enormous profits.

159.     Additionally, the circumstances give rise to a strong inference that Credit Suisse knew or recklessly disregarded **on** February 5, 2018 that a VIX futures liquidity gap lay immediately ahead and/or was in the midst of transpiring and/or had transpired that very day.

160.     Given the considerable market capitalizations of XIV and other volatility-linked ETPs by February 5, 2018, and the activity in the stock market that day, including a spike in the VIX Index (from historically low levels), Credit Suisse knew that there was a certainty that a VIX futures liquidity gap would develop, propelling VIX futures prices skyward and obliterating XIV's value.  Credit Suisse also actively traded VIX futures that day, and, hence, had first-hand visibility into the liquidity gap as it developed and engulfed the VIX futures market.   As set forth above, Credit Suisse made enormous profits for its own account on February 5, 2018 front-running those developments.

161.     Further, given that Credit Suisse closely monitored its rebalancing requirements and ETN obligations in real time order to protect its capital and comply with regulatory requirements, it would have known that, as of 3:50 p.m. ET on February 5, 2018, XIV's rebalancing required the purchase of in excess of 50,000 VIX futures – an amount exceeding the "position accountability level" of CFE Rule 412A, which was established to "reduce the potential risk of price distortions and market disruptions" – triggering an obligation on the part of Credit Suisse to notify the CFE.  In fact, it is believed that Credit Suisse provided the requisite Rule 412A notice to the CFE – or, at minimum, concluded that such a notice was required – by at least 3:50 p.m. ET on February 5, 2018, given what it would have known about XIV's rebalancing requirements by that time on that day.  Yet, Credit Suisse omitted to issue any notice to the general public.

162.    By virtue of Credit Suisse's real-time monitoring of its rebalancing requirements and ETN obligations and active involvement in the VIX futures market, as alleged above, Credit Suisse also would have known by 4:00 p.m. ET on February 5, 2018, that XIV's daily rebalancing requirements had jumped to 59,000 VIX futures contracts.  It also would have known that by at least 4:10:125 p.m. ET, XIV's economic value had fallen more than 80%, entitling Credit Suisse to "effect an Event Acceleration", and that, at 4:11:00 p.m. ET, XIV's economic value temporarily fell below zero, meaning that Credit Suisse was entitled to mark the Indicative Value at zero "on that day, and all future days ….".

### B.    The Individual Defendants' Familiarity with the Operations and Financial Results of Credit Suisse's Equity Derivatives Business

163.    The circumstances also give rise a strong inference that the Individual Defendants knew about or recklessly disregarded the risk of a liquidity-gap in VIX futures which would devastate XIV.  In Credit Suisse's public earnings calls with analysts each quarter, the Individual Defendants made statements, and held themselves out as particularly knowledgeable, about Credit Suisse's equity derivatives business and its financial results and operations, of which Credit Suisse's volatility-linked ETN products – including XIV – comprised a significant part.

164.    Indeed, at all relevant times, a material portion of the revenues of Credit Suisse's equity derivatives business stemmed from the fees that Credit Suisse earned in connection with managing the firm's volatility-linked ETNs, of which XIV was the largest.  Credit Suisse's equity derivatives business also generated substantial revenues in the form of trading profits from front-running those ETNs' daily rebalancing.  It thus can be strongly inferred that the Individual Defendants knew of the liquidity-gap risks to XIV, inasmuch as those risks – which eventually materialized – threatened the ability of Credit Suisse's equity derivatives business to continue earning those fees and profits.

165.    On Credit Suisse's Q3 2017 Earnings Call of November 2, 2017, defendant Thiam remarked to analysts that the revenues of Credit Suisse's equity derivatives business were "volatility-dependent."  On the same earnings call, defendant Mathers stated that Credit Suisse had "seen a pick-up in equity sales and trading activities where we benefited from the higher volatility in Asian markets and some improvement in client activity, primarily in equity derivatives."

166.    Similarly, on Credit Suisse's Q2 2017 Earnings Call of July 28, 2017, defendant Mathers described a "difficult environment for equity sales and trading" which he attributed to a "lower market volatility and a continued low level of client activity particularly in Equity Derivatives …."  On that same call, defendant Thiam stated that the firm's equity derivatives business was "hit hard by the low volatility.  So, we're not getting those revenues."

167.    Likewise, on Credit Suisse's Q1 2017 Earnings Call of April 26, 2017, defendant Mathers commented that "low levels of volatility … adversely impacted our equity derivatives business", while defendant Thiam stated that such business is nevertheless "amazingly strong" and had a new manager, Ken Pang, who "has done a phenomenal job there."  And on Credit Suisse's Q4 2016 Earnings Call of February 2, 2016, defendant Mathers commented on "weaker performance in equity derivatives, partly reflecting low levels of volatility in the quarter."

168.    It is thus clear that the Individual Defendants would have known of or recklessly disregarded the undisclosed liquidity-gap risks to XIV alleged above.

### C.    Credit Suisse's Risk Management Systems and the Personal Involvement of the Individual Defendants

169.    Defendants also had numerous risk protocols and procedures in place which raise a strong inference that they knew or recklessly disregarded the adverse undisclosed facts detailed herein.  In particular, the Individual Defendants, as the senior most executive officers of Credit Suisse, made, or caused to be made, the misleading statements and omissions alleged herein,

including by signing the Registration Statement.   Indeed, the Individual Defendants held themselves out to investors as persons particularly knowledgeable about the reasons for the XIV's collapse and the content of the Registration Statement.  For example, following the February 5, 2018 collapse of the XIV, defendant Thiam told investors that, as a result of his personal involvement, "*I know the [Registration Statement] by heart now*."

170.    In addition, due to the risk management structure in place at Credit Suisse, its senior executives – including the Individual Defendants – knew, or at the very least, recklessly disregarded the liquidity issues in the VIX futures market that threatened the XIV.  On March 24, 2017, Credit Suisse filed its 2016 Annual Report with the SEC on Form 20-F (the "2016 Annual Report"), which detailed Credit Suisse's extensive risk protocols and reporting mechanisms.  The 2016 Annual Report stated that "the prudent taking of risk in line with our strategic priorities" was "fundamental" to Credit Suisse's business as a leading global bank and "ensuring that capital is well deployed to support business activities." In describing Credit Suisse's "disciplined" risk culture, the 2016 Annual Report stated:

> We base our business operations on conscious and disciplined risk-taking.
>
> ***
>
> – We establish a clear risk appetite that sets out the types and levels of risk we are prepared to take.
>
> – We actively monitor risks and take mitigating actions where they fall outside accepted levels.
>
> – Breaches of risk limits are identified, analyzed, and escalated, and large, repeated or unauthorized exceptions may lead to terminations, adverse adjustments to compensation or other disciplinary action ….

171.    The 2016 Annual Report emphasized that, to ensure the effectiveness of Credit Suisse's risk controls, there was "strong involvement of senior management and the Board of Directors" in its risk management procedures.  Indeed, the 2016 Annual Report stated Credit

Suisse had established a sub-committee of its Executive Board, the Capital Allocation and Risk Management Committee ("CARMC"), consisting wholly of Credit Suisse's most senior officers. CARMC met regularly on a monthly basis and included "the chief executive officers (CEOs) of [Credit Suisse] and the divisions, the Chief Financial Officer, the Chief Risk Officer (CRO), the Chief Compliance and Regulatory Officer and the Treasurer." Thus, defendants Thiam and Mathers were members of the CARMC during the Relevant Period.

172.    Further, the 2016 Annual Report stated that CARMC also played a central role in the Credit Suisse's risk management procedures, as it was responsible for actively monitoring risks at the highest level, recommending overall risk limits to the Board, and setting and allocating risk limits among Credit Suisse's different lines of business. It stated in pertinent part:

> [CARMC] is responsible for supervising and directing our risk profile, **recommending risk limits** at the Group level to the Risk Committee and the Board, establishing and allocating risk limits among the various businesses, and for developing measures, methodologies and tools **to monitor and manage the risk portfolio**.

173.    The 2016 Annual Report explained that risk limits were critical to Credit Suisse's risk management procedures, as they were designed "to maintain our risk profile within our overall risk appetite." It explained that "[l]imits are binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs." The 2016 Annual Report also stated that, "[w]hile the primary purpose [of risk limits] is risk management, risk limits are also useful tools in the identification of trading misconduct and unauthorized trading activities."

174.    The 2016 Annual Report further stated Credit Suisse had several levels of risk limits within its extensive risk management framework, the breach of any one of which would trigger immediate escalation procedures to notify senior management.  Specifically, the 2016 Annual Report stated the "overall risk limits" for Credit Suisse were "set by the Board in consultation with the Risk Committee and are binding," and that any breach of these limits "would result in an

*immediate notification to the chairman of the Board's Risk Committee and the Group CEO,* and

written notification to the full Board at its next meeting":

> The overall risk limits for the Group are set by the Board in consultation with its
> Risk Committee *and are binding*. In the rare circumstance where a breach of these
> limits would occur, it would result in an ***immediate notification to the Chairman
> of the Board's Risk Committee and the Group CEO***, and written notification to
> the full Board at its next meeting.  Following notification, the Group CRO may
> approve positions that exceed the Board limits up to a predefined level and any such
> approval is reported to the full Board. Positions that exceed the Board limits by
> more than the predefined level may only be approved by the Group CRO and the
> full Board acting jointly.  In 2016 and 2015, no Board limits were exceeded.

175.    Thus, defendant Thiam, as CEO of Credit Suisse, received "immediate

notification" of any and all breaches of risk limits, including those relating to XIV.

176.    The next level of risk limits was set by CARMC "[i]n the context of the overall risk

appetite of the Group, as defined by the limits set by the Board and its Risk Committee."

Specifically, CARMC was "responsible for allocating divisional risk limits and more specific

limits deemed necessary to control the concentration of risk within individual lines of business."

The 2016 Annual Report emphasized that CARMC's "limits are binding and generally set close

to the planned risk profile to ensure that any meaningful increase in risk exposures is promptly

escalated."  The final level of limits was set by divisional management, who would "use a detailed

framework of individual risk limits designed to control risk-taking at a granular level by individual

businesses and in the aggregate."   These risk controls were intended to, among other things,

"trigger senior management discussions with the businesses involved, risk management and

governance committees in case of substantial change in the overall risk profile."  While "divisional

chief risk officers and certain other members of senior management" had authority to "temporarily

increase" these more granular limits "by an approved percentage for a specified maximum period,"

significantly, any excess was "subject to formal escalation procedure . . . with escalation to senior

management if certain thresholds are exceeded."

177.    Credit Suisse also had a Valuation Risk Management Committee ("VARMC"), which was chaired by its CFO, defendant Mathers.  The VARMC "is responsible for establishing policies regarding the valuation of certain material assets and the policies and calculation methodologies applied in the valuation process."  The VARMC determined Credit Suisse's Value-at-Risk ("VaR") regimen, including as it related to a product like XIV.  As described in the 2016 Annual Report, the VaR metric was "one of the main risk measures for [risk] limit monitoring." It continued in pertinent part: "[VaR] quantifies the potential loss on a given portfolio of financial instruments over a certain holding period and that is expected to occur at a certain confidence level."  Specifically, Credit Suisse's VaR model uses a

> two-year historical dataset, a one- day holding period and a 98% confidence level. This means that we would expect daily mark-to-market trading losses to exceed the reported VaR not more than twice in 100 trading days over a multi-year observation period. . . .   Our VaR used for limit monitoring purposes also uses a two-year historical dataset, a one-day holding period and a 98% confidence level.

Credit Suisse also "estimate[d] losses associated with unusually severe market movements," "including stressed VaR, position risk and scenario analysis."

178.    In addition, the 2016 Annual Report described another Credit Suisse risk committee, the Risk Processes & Standards Committee ("RPSC"), which "reviews major risk management processes, issues general instructions, standards and processes concerning risk management, approves material changes in market, credit and operational risk management standards, policies and related methodologies, and approves the standards of [Credit Suisse's] internal models used for calculating regulatory capital requirements."  The RPSC would have reviewed the liquidity issues and risks to Credit Suisse posed by XIV and Credit Suisse's volatility-linked ETNs more generally.

179.     Finally, the 2016 Annual Report described the Reputational Risk & Sustainability Committee ("RRSC"), which "sets policies and reviews processes and significant cases relating to reputational risks and sustainability issues.  It also ensures compliance with [Credit Suisse's] reputational and sustainability policies and oversees their implementation."  In other words, the RRSC was tasked with minimizing reputational risks and preventing negative publicity, such as the negative coverage that Credit Suisse received following the destruction of the XIV.

180.     Credit Suisse's extensive risk management protocols and procedures required Credit Suisse and the Individual Defendants to become fully apprised of the undisclosed adverse facts alleged in ¶¶ 5-7, 65-90.  XIV exposed Credit Suisse to nearly $2 billion in potential liabilities if it were unable to rebalance due to the VIX futures market's limited liquidity.  By comparison, in 2017, Credit Suisse's entire adjusted consolidated pre-tax income was only roughly CHF 2.8 billion (about $2.8 billion).  Indeed, as alleged above, in recognition of the material risks posed by the rebalancing requirements of XIV, in July 2016 Credit Suisse changed the conditions under which it would sell new XIV ETNs, allowing it to "condition its acceptance of a counterparty's offer to purchase the ETNs on its agreement to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps."  This change would have been reviewed and approved by Defendants pursuant to the risk management protocols and procedures detailed herein.

181.     In particular, because of their positions with Credit Suisse and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations being made were then materially misleading.  Indeed, the Individual Defendants have acknowledged their personal involvement with XIV given their

role in Credit Suisse's overall risk management controls.  On February 14, 2018, defendant Thiam

was interviewed by *Bloomberg* and stated that the decision to review the risks posed by XIV and

to trigger the acceleration event on February 5, 2018 were run through the Company's extensive

risk management procedures.  He stated that, while he did not make the decisions individually,

they involved people "from every aspect of the business."  He stated in pertinent part:

> Because the product stopped trading, it was quasi-impossible to price, and we
> needed to give certainty to the market at the market open. So before the morning –
> and this – *we* went through a long process, *we* don't make these decisions lightly,
> there are people involved from every aspect of the business, from compliance to
> the front office – and they collectively – I don't make those types of decisions –
> they collectively reached a decision which was in the interest of investors, which
> was to close it.

### D.   Credit Suisse's Knowledge or Reckless Disregard of the Inaccuracy of the Indicative Value after 4:00 p.m. ET

182.    At all times, Credit Suisse also knew or recklessly disregarded the inaccuracy of

the Indicative Value after 4 p.m. ET.  Credit Suisse had access to information clearly showing that

inaccuracy.  Specifically, as a large financial institution and the issuer and underwriter of XIV,

Credit Suisse had access to the prices of VIX futures (which it actively traded) and to the data

feeds for the VIX Short-Term Futures Index and XIV's Indicative Value.  Additionally, Credit

Suisse held itself out as knowledgeable about those data in the January Supplement, and had a duty

to make sure that the statements it made therein regarding them were correct, did not omit material

information, and were not materially misleading.   The inaccuracy of the Indicative Value was

readily ascertainable from those data by a highly sophisticated financial institution such as Credit

Suisse.

## VII.   LOSS CAUSATION

183.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss suffered by Plaintiff.  The price of XIV ETNs significantly declined when the

information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

184.    Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of XIV ETNs and operated as a fraud or deceit on purchasers of XIV ETNs.  As detailed above, when the truth about the risks to XIV were revealed, the value of XIV ETNs declined precipitously as the prior artificial inflation no longer propped up the XIV's price. The declines in the price of XIV ETNs were the direct result of the nature and extent of the risks to XIV finally being revealed to investors and the market.  The timing and magnitude of the ETN price declines negate any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors or XIV-specific facts unrelated to the undisclosed risks complained of herein.  The economic loss, *i.e.*, damages, suffered by Plaintiff, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of XIV ETNs and the subsequent significant decline in the value of the XIV ETNs when defendants' misleading statements and omissions and the true risks facing XIV ETNs were revealed.

185.    At all relevant times, Defendants' materially misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Plaintiff.  Those statements were materially misleading and omitted material facts through their failure to disclose a true and accurate picture of the XIV's business, operations and risks, as alleged herein.  Plaintiff would not have purchased XIV ETNs at all or at the prices that Plaintiff paid had it known of the undisclosed risks alleged herein.  Before and during the time of Plaintiff's purchases of XIV ETNs, Defendants issued materially misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of XIV ETNs to be artificially inflated.

Plaintiff purchased XIV ETNs at those artificially inflated prices, causing it to suffer tens of millions of dollars in damages as complained of herein.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE

### A.   Entitlement to a Presumption of Reliance under the Fraud-on-the-Market Doctrine

186.   At all relevant times, the market for XIV ETNs was an efficient market for the following reasons, among others:

a.   XIV ETNs met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient and automated market;

b.   The average daily trading volume of XIV was approximately 10 million ETNs in the 12 months preceding its collapse.

c.   Credit Suisse and XIV were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

d.   according to VelocityShares' website, as of February 5, 2018, there were nearly 15 million XIV ETNs issued and outstanding, demonstrating a very active and broad market for XIV ETNs;

e.   as a regulated issuer, Credit Suisse filed periodic public reports with the SEC;

f.   Defendants and the Calculation Agents regularly communicated with public investors via established market communication mechanisms regarding XIV, including the regular dissemination of information regarding XIV on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

g.     unexpected material news about XIV was rapidly reflected in and incorporated into the price of XIV ETNs.

187.    Moreover, analysis indicates that at all relevant times prior to February 5, 2018, the market price of XIV hewed closely to XIV's Indicative Value.  Any divergences between the market price and the Indicative Value were immaterial and promptly disappeared in active trading.

188.    As a result of the foregoing, the market for XIV ETNs promptly digested current information regarding the XIV from publicly available sources and reflected such information in the price of XIV ETNs.  Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of XIV ETNs.

**B.     Entitlement to a Presumption of Reliance under *Affiliated Ute Citizens of Utah v. United States***

189.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding XIV's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' materially misleading statements and omissions set forth above, that requirement is satisfied here.

## IX.    NO SAFE HARBOR

190.    Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by Defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

191.    Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing XIV, and thus were ineffective to shield those statements from liability.

192.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Credit Suisse who knew that the FLS was false.   Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## X.    EXCHANGE ACT CLAIMS

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5

### Promulgated Thereunder Against All Defendants

193.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

194.    Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiff, as alleged herein; and (ii) cause Plaintiff to purchase XIV ETNs at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

195.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of XIV ETNs in an effort to maintain artificially

high market prices for XIV ETNs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

196.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about XIV ETNs, as specified herein.

197.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about XIV ETNs and their risks and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of XIV ETNs.

198.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Credit Suisse and members of Credit Suisse's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of Credit Suisse, was privy to and participated in the creation and development of the Registration Statement and other public statements and omissions of Credit Suisse about XIV ETNs; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of

Credit Suisse's management team, internal reports and other data and information about XIV ETNs at all relevant times; and (iv) each of these defendants was aware of Credit Suisse's dissemination of information to the investing public regarding XIV ETNs which they knew or recklessly disregarded was materially false and misleading.

199.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the risks facing XIV ETNs from the investing public and supporting the artificially inflated price of XIV ETNs.  As demonstrated by defendants' misstatements and omissions, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of XIV ETNs was artificially inflated.  In ignorance of the fact that market prices of XIV ETNs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants, Plaintiff acquired XIV ETNs at artificially high prices and was damaged thereby.

200.    At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Plaintiff and the marketplace known the truth regarding

63

the risks facing XIV ETNs, which were not disclosed by defendants, Plaintiff would not have purchased or otherwise acquired XIV ETNs, or, if Plaintiff had acquired XIV ETNs, it would not have done so at the artificially inflated prices which it paid.

201.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

202.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases and sales of XIV ETNs.

## COUNT II

### For Violation of §9(a)(4) of the Exchange Act

### Against All Defendants

203.    Plaintiff incorporates the foregoing paragraphs by reference.

204.    During the Relevant Period, Defendants had authority over or controlled the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

205.    Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading

206.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for XIV ETNs. Plaintiff would not have purchased XIV ETNs at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

207.    As a direct and proximate result of Defendants' wrongful conduct, plaintiff suffered damages in connection with its purchases of XIV ETNs.

## COUNT III

### For Violation of §9(f) of the Exchange Act

### Against All Defendants

208.    Plaintiff incorporates the foregoing paragraphs by reference.

209.    Each Defendant willfully participated in the Credit Suisse's violation of §9(a) of the Exchange Act.  All defendants willfully participated in Credit Suisse's making of, or control over, untrue statements of material fact and/or omissions to state material facts necessary to make the statements not misleading

210.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for XIV ETNs.  Plaintiff would not have purchased XIV ETNs at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

211.    As a direct and proximate result of Defendants' willful participation in the foregoing wrongful conduct, Plaintiff suffered damages in connection with its purchases of XIV ETNs.

## COUNT IV

### For Violation of §20(a) of the Exchange Act

### Against All Defendants

212.    Plaintiff incorporates the foregoing paragraphs by reference.

213.    Each of the Defendants named herein were control persons within the meaning of §20(a) of the Exchange Act.

214.   The Individual Defendants were each control persons of Credit Suisse by virtue of their positions as directors and/or senior officers of Credit Suisse and CSI.   The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Credit Suisse.   The Individual Defendants signed the Registration Statement and were responsible for its contents and held themselves out to investors as among those most knowledgeable about the XIV.

215.   Credit Suisse controlled the Individual Defendants and all of its employees.

216.   The Defendants named herein each were culpable participants in the violations of §9 and §10(b) of the Exchange Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement, constructing and managing the XIV, creating and disseminating the Registration Statement, marketing and selling XIV ETNs and/or having otherwise participated in the process that allowed the offer and sale of XIV ETNs to investors to be successfully completed.

## XI.   SECURITIES ACT CLAIMS

### A.   Disclaimer of any Allegation Based on Fraud

217.   In the allegations and claims set forth in this part of the Complaint, Plaintiff asserts a series of strict liability and negligence claims based on the Securities Act and the Pennsylvania law.   Plaintiff's Securities Act and Pennsylvania law claims are not based on any allegations of knowing or reckless misconduct on behalf of any of the Defendants.   Plaintiff's Securities Act and Pennsylvania law claims do not allege, and do not sound in, fraud, and Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act and Pennsylvania law.

### B.   The 2018 Offering

218.    As alleged above, the offering documents for XIV consisted of a registration statement on Form F-3 filed with the SEC on June 8, 2017, which was subsequently amended, including by means of a prospectus supplement for the offer and sale of XIV ETNs filed with the SEC on January 29, 2018, on Form 424B2 (previously defined as the "2018 Supplement"), which was incorporated into and formed part of the registration statement (previously defined as the "Registration Statement").

219.    Credit Suisse offered 16.3 million XIV ETNs for sale pursuant to the 2018 Supplement (the "2018 Offering").

C.    **The Misleading Statements and Omissions in the Registration Statement**

220.    The Registration Statement omitted material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

221.    The 2018 Supplement warned investors of "**Long Holding Period Risk**," stating in pertinent part:

> The ETNs … are intended to be trading tools for sophisticated investors to manage ***daily trading risks***.  ***They are designed to achieve their stated investment objectives on a daily basis***, but their performance over longer periods of time can differ significantly from their stated daily objectives.  The ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for ***longer than one day***.  Investors should actively and frequently monitor their investments in the ETNs, ***even intra-day***.

222.    The 2018 Supplement additionally warned investors that "**The long term expected value of your ETNs is zero.**  If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment."

223.    The 2018 Supplement went on to describe XIV as an appropriate vehicle for short-term investment objectives, stating in pertinent part:

The ETNs may be a suitable investment for you if ….

- You are a sophisticated investor seeking to manage *daily trading risk using a short-term investment*, and are knowledgeable and understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.

- You believe the level of the applicable underlying Index will increase … or decline (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment *during the time you hold the ETNs*.

*** 

- You are a sophisticated investor using the ETNs *to manage daily trading risks* and you understand that the ETNs are designed to achieve their stated investment objectives *on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives*.

224.    The statements from the 2018 Supplement set forth in ¶¶ 220-23 above omitted to state material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, for at least the following reasons:  (i) by at least January 29, 2018, XIV was inappropriate for even daily or short-term – and not just "long-term" – trading, as it was subject to a high likelihood of catastrophic losses in a matter of  minutes and faced the threat of collapse if there was any relatively small increase in volatility, as alleged above in ¶¶ 65-76, 78-80; and (ii) thus, even investors like Plaintiff which did not plan to hold XIV for longer than one day and who monitored their portfolios regularly risked loss of a "substantial portion of your investment" because the short-term – and not just the "long term" – expected value of XIV was also "zero" on any day where volatility increased appreciably, as alleged above in ¶¶ 65-76, 78-80.  The 2018 Supplement misleadingly omitted to disclose these material facts.

225.    The 2018 Supplement also stated in pertinent part:

SUPPLEMENTAL USE OF PROCEEDS AND HEDGING

We intend to use the net proceeds from this offering for our general corporate purposes, which may include the refinancing of our existing indebtedness outside Switzerland. We may also use some or all of the net proceeds from this offering to hedge our obligations under the ETNs of the applicable series.  One or more of our affiliates before and following the issuance of the ETNs of any series may acquire or dispose of the futures contracts underlying the applicable Index, or listed or over-the-counter options contracts in, or other derivatives or synthetic instruments related to, the applicable underlying Index or the S&P 500® Index or the VIX Index to hedge our obligations under the ETNs of such series. In the course of pursuing such a hedging strategy, the price at which such positions may be acquired or disposed of may be a factor in determining the levels of the applicable underlying Index. Although *we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index*, there can be no assurance that the level of the applicable underlying Index will not be affected.

226.    The statements from the 2018 Supplement set forth in the foregoing paragraph omitted to state material facts, including material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, for at least the following reasons: (i) by at least January 29, 2018, XIV was subject to a high likelihood of catastrophic losses in a matter of minutes and faced the threat of collapse if there was any relatively small increase in stock market volatility, as alleged above in ¶¶ 65-76, 78-80; and (ii) given the considerable growth which had occurred in the market capitalizations of inverse and leveraged volatility-linked ETPs (including, primarily, XIV) by January 29, 2018, there was a material risk that Credit Suisse's hedging activities – as well as those of other volatility-linked ETP issuers and other traders – would have a highly material impact on VIX futures (and, thus, on the VIX Short-Term Futures Index) in the event of any relatively small increase in volatility, as alleged above in ¶¶ 65-76, 78-80.  The 2018 Supplement misleadingly omitted to disclose these material facts.

227.    The 2018 Supplement additionally stated in relevant part:

*Intraday Indicative Value*

The "**Intraday Indicative Value**" for each series of ETNs is *designed to reflect the economic value of such series of ETNs at a given time*. It is calculated using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time. *The Intraday Indicative Value of each series of ETNs will be calculated every 15 seconds on each Index Business Day* during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor, and will be published under the applicable Indicative Value ticker for such series of ETNs, as set forth on the cover of this pricing supplement. **If the Intraday Indicative Value is equal to or less than zero at any time or the Closing Indicative Value is equal to zero on any Index Business Day, the Closing Indicative Value on that day, and all future days, will be zero.**

228.    The 2018 Supplement also stated:

The "Intraday Indicative Value" for each series of ETNs is designed to approximate the economic value of such series of ETNs at a given time. It is calculated using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time. The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day[8] during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor. If the Intraday Indicative Value is equal to or less than zero at any time or the Closing Indicative Value is equal to zero on any Index Business Day, the Closing Indicative Value on that day, and all future days, will be zero. See "Description of the ETNs – Intraday Indicative Value" in this pricing supplement. JIC or its affiliate is responsible for computing and disseminating the Intraday Indicative Value.

The Intraday Indicative Value is a calculated value and is not the same as the trading price of the ETNs and is not a price at which you can buy or sell the ETNs in the secondary market. The Intraday Indicative Value does not take into account the factors that influence the trading price of the ETNs, such as imbalances of supply and demand, lack of liquidity and credit considerations. **The actual trading price of the ETNs in the secondary market may vary significantly from their Intraday Indicative Value.**

*Investors can compare the trading price of the ETNs (if such concurrent price is available) against the Intraday Indicative Value to determine whether the ETNs*

---

8    An "Index Business Day" is defined as "a day on which (i) trading is generally conducted on the CBOE, (ii) the applicable underlying Index is published by S&P and (iii) trading is generally conducted on [the New York Stock Exchange]."

*are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time*.  Investors are cautioned that paying a premium purchase price over the Intraday Indicative Value at any time could lead to the loss of any premium in the event the investor sells the ETNs when the premium is no longer present in the marketplace or when the ETNs are accelerated (including at our option, which we have the discretion to do at any time).  It is also possible that the ETNs will trade in the secondary market at a discount below the Intraday Indicative Value and that investors would receive less than the Intraday Indicative Value if they had to sell their ETNs in the market at such time.

229.     The 2018 Supplement stated with respect to the VIX Short-Term Futures Index:

The level of each Index is calculated in accordance with the method described below.  The value of each Index *will be published by Bloomberg in real time* and after the close of trading on each Index Business Day ….

*The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day using the same methodology as for calculation of the closing level but applying real time prices of the relevant VIX futures contracts*.

230.     The statements from the 2018 Supplement set forth in ¶¶ 227-29 above omitted to

state material facts, including material facts necessary in order to make the statements made, in the

light of the circumstances under which they are made, not misleading, for at least the following

reasons: (i) XIV's Indicative Value generally was not updated and was therefore inaccurate from

4:00 p.m. to at least 6:00 p.m. ET each trading day, despite that the VIX futures market was open

for trading – and that real-time VIX futures prices were therefore available – for all but 15 minutes

of that time period, as alleged above in ¶¶ 23-28, 103-15; (ii) this was because S&P, which

published the VIX Short-Term Futures Index (which the Calculation Agents used to compute the

Indicative Value), did not update that index from 4:00 p.m. to at least 6:00 p.m. ET daily, but,

instead, published stale and/or inaccurate values, as alleged above in ¶¶ 23-28, 103-15; and (iii) as

a result, for such daily time period, the VIX Short-Term Futures Index was not based on "real time

prices of the relevant VIX futures contracts" and the Indicative Value was not useful for

"comparing against" the market prices of XIV "to determine whether the ETNs are trading in the

secondary market at a premium or a discount to the economic value of the ETNs at any given time", as alleged in ¶¶ 23-28, 103-15. The 2018 Supplement misleadingly omitted to disclose these material facts.

231.    The 2018 Supplement additionally provided numerous "hypothetical examples" to "show how the ETNs would perform in hypothetical circumstances" and "illustrate the effect that different factors may have on the Maturity Redemption Amount." The 2018 Supplement provided four hypothetical scenarios, each of which reinforced the misleading impression that the XIV was subject to risks within the range of ordinary trading risks. The hypotheticals showed annualized XIV returns as high as 124.44%, while the worst-case scenario illustrated a loss of 85.84% annualized over the course of one year. These examples were materially misleading because nowhere did the 2018 Supplement disclose that the XIV could lose almost the entirety of its value in a matter of minutes for the reasons alleged above in ¶¶ 65-76, 78-80.

232.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the 2018 Supplement to disclose any of the adverse facts alleged above in ¶¶ 65-76, 78-80, and 103-09, which made the XIV's collapse inevitable, violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed risks would (and did) have an unfavorable impact on the XIV's continuing operations. This failure also violated 17 C.F.R. §229.503(c), because these specific risks were not adequately

72

disclosed, or disclosed at all, even though they were some of the most significant factors that, as of at least January 29, 2018, made an investment in XIV so speculative or risky in afterhours trading that no reasonable investor would have purchased or held XIV at those times.

> ### D.    Securities Act Counts
>
> ### COUNT V
>
> ### For Violations of §11 of the 1933 Act
>
> ### Against All Defendants

233.    Plaintiff repeats and realleges ¶¶ 1-3, 39-48, 51-71, 74-75, and 217-32, by reference.

234.    This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, against all Defendants.

235.    The Registration Statement inclusive of the 2018 Supplement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

236.    Credit Suisse AG was the registrant for the XIV ETNs.  As the issuer of the shares, Credit Suisse AG is strictly liable to plaintiff for the misstatements and omissions.

237.    Each of the Defendants was responsible for the contents and dissemination of the Registration Statement including the 2018 Supplement.   In addition, defendants Thiam and Mathers both signed the Registration Statement and Defendant CSSU served as the underwriter for the January 2018 Offering.

238.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

239.    By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

240.    Plaintiff purchased XIV ETNs pursuant to the Registration Statement.

241.    Plaintiff has sustained damages. The value of XIV ETNs has declined substantially subsequent to and due to Defendants' violations.

242.    At the time of its purchases of XIV ETNs, Plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein.  Plaintiff entered into a tolling agreement with Defendants, and less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff filed this complaint, inclusive of the period of tolling to which Defendants agreed.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT VI

### For Violation of §15 of the 1933 Act

### Against All Defendants

243.    Plaintiff repeats and realleges ¶¶ 1-3, 39-48, 51-71, 74-75, and 217-42 by reference.

244.    This Count is brought pursuant to §15 of the 1933 Act against all Defendants.

245.    The Individual Defendants were each control persons of Credit Suisse AG and CSSU by virtue of their positions as directors and/or senior officers of Credit Suisse AG and CSSU.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Credit Suisse AG and CSSU. The Individual Defendants signed the Registration Statement and were responsible for its contents.

246.     Credit Suisse AG and CSSU also controlled the Individual Defendants and all of its employees.

247.     The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement, constructing and managing the XIV, creating and disseminating the Registration Statement, marketing and selling XIV ETNs and/or having otherwise participated in the process that allowed the offer and sale of XIV to investors be successfully completed.

**XII.     PENNSYLVANIA LAW CLAIMS**

**COUNT VII**

**For Violation of The Pennsylvania Securities Act,**

**70 Pa. Cons. Stat. § 1-401(b)**

**Against Defendants Credit Suisse AG and CSSU Pursuant to**

**70 Pa. Cons. Stat. §§ 1-501 and 1-503**

248.     Plaintiff repeats and realleges ¶¶ 1-3, 39-48, 51-71, 74-75, and 217-48 by reference.

249.     This claim is brought pursuant to 70 Pa. Cons. Stat. §§ 1-401, 1-501, and 1-503 against Defendants Credit Suisse AG and CSSU.

250.     The January 29, 2018 Pricing Supplement states that XIV notes are "Issued by Credit Suisse AG."

251.     Defendant CSSU is identified in the 2018 Supplement as the underwriter of XIV.

252.     Credit Suisse marketed XIV to investors, including Plaintiff.  For example, Credit Suisse published a Prospectus and a Prospectus Supplement advertising XIV on June 30, 2017. Credit Suisse also published periodic pricing supplements further advertising XIV, including on June 30, 2017, August 18, 2017, and January 29, 2018.  In the June 30, 2017 Supplement, Credit

Suisse states that Defendant CSSU "is a distributor for offers and sales of the [XIV]."  In the 2018 Supplement, Credit Suisse states that Defendant CSSU "is the underwriter for the offering and sale of the ETNs of each series."  Because of Credit Suisse's marketing efforts, XIV became a popular tool for investors to take short positions in implied volatility.

253.    Accordingly, at all times relevant, Defendants Credit Suisse AG and CSSU offered or sold a security, namely XIV ETNs, within the meaning of 70 Pa. Cons. Stat. § 1-501(a)(ii).

254.    In the alternative, Defendant CSSU acted as an agent for Defendant Credit Suisse AG who materially aided in the act or transaction constituting the violation within the meaning of 70 Pa. Cons. Stat. § 1-503(a).

255.    As described above, Defendants Credit Suisse AG and CSSU, in connection with the offer, sale or purchase of a security in Pennsylvania, namely the purchases Plaintiff made of XIV notes on February 5, 2018, and the forced undervalued sales and redemption of said notes, directly or indirectly, made at least one untrue statement of a material fact or omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, namely the false representations described above, in violation of 70 Pa. Cons. Stat. § 1-401(b).

256.    Plaintiff purchased a security, namely XIV notes, offered by Defendants Credit Suisse AG and CSSU.

257.    As a result of their violations of 70 Pa. Cons. Stat. § 1-401(b), Defendants Credit Suisse AG and CSSU are jointly and severally liable to, or required to provide equitable relief to, SFT pursuant to 70 Pa. Cons. Stat. §§ 1-501(a), 1-503(a).

258.    Plaintiff repeats and realleges the foregoing paragraphs by reference. For the reasons alleged in ¶¶ 220-32, the Registration Statement contained untrue statements of material

fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

259.    At all times relevant, each of the Individual Defendants was a partner, principal executive officer or director, or a person occupying a similar status or performing similar functions, of Defendant Credit Suisse AG, within the meaning of 70 Pa. Cons. Stat. § 1-503(a).

260.    As a result, the Individual Defendants are jointly and severally liable to, or required to provide equitable relief to, Plaintiff pursuant to 70 Pa. Cons. Stat. § 1-503 for the violations of 70 Pa. Cons. Stat. § 1-401(b) committed by Defendant Credit Suisse AG.

261.    Plaintiff received notice of the misstatements and omissions in connection with the offer of XIV by Credit Suisse on January 29, 2018, as described above, on or after February 5, 2018.  In the exercise of reasonable diligence, Plaintiff could not have known of the misstatements and omissions described above before February 5, 2018.

## COUNT VIII

### For Common Law Negligent Misrepresentation

### Against All Defendants

262.    Plaintiff repeats and realleges ¶¶ 1-3, 39-48, 51-71, 74-75, and 217-61 by reference.

263.    Defendants owed Plaintiff a duty to provide materially correct information by virtue of the fact that Defendants engaged in XIV-related transactions in which Defendants had a pecuniary interest.

264.    Defendants made the material false statements and omissions described above when they knew or should have known that such representations were materially false and/or misleading or omitted facts necessary to make statements they had already made not misleading.

265.    Defendants knew and intended that investors such as Plaintiff would rely on the false representations and omissions described above in deciding whether to purchase XIV ETNs.

266.    Plaintiff acquired XIV ETNs in ignorance of the misrepresentations and omissions alleged above, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants, and was damaged thereby.

267.    As the false statements, half-truths and omissions described above were disclosed and became apparent to the market, the price and value of XIV ETNs declined significantly. By failing to disclose to investors the adverse facts described above, Defendants misled investors, including Plaintiff, as to the true risks of XIV ETNs. The material facts that were omitted or misstated by Defendants, including as to the true risks of XIV ETNs, proximately caused Plaintiff's losses.

268.    Plaintiff suffered damages from the negligent acts and omissions by Defendants Plaintiff would not have purchased XIV ETNs at the prices it paid, or at all, if it had been aware of the adverse facts described above.

269.    Plaintiff received notice of the misstatements and omissions described above after February 5, 2018.  In the exercise of reasonable diligence, Plaintiff could not have known of the misstatements and omissions described above before February 5, 2018.

270.    The damages described above incurred by Plaintiff were caused by negligent misrepresentations of Defendants.

## COUNT IX

### For Common Law Fraud

### Against All Defendants

271.   Plaintiff incorporates ¶¶1-216 by reference.

272.   Plaintiff brings a common law claim for fraud against all defendants.

273.   As alleged above, defendants provided Plaintiff with materially false or misleading material information and failed to disclose material facts about XIV ETNs.

274.   Defendants made those misrepresentations and omissions with knowledge of their falsehood.  The misrepresentations and omissions made by defendants were intended to induce and actually induced Plaintiff to invest in XIV ETNs.

275.   Plaintiff invested in XIV ETNs in ignorance of the misrepresentations and omissions alleged above, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants, and was damaged thereby.

276.   The fraudulent actions of defendants caused damages to Plaintiff which is entitled to damages and other legal and equitable relief as a result.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.   Awarding plaintiff compensatory damages at an amount to be determined at trial and pdre-judgment and post-judgment interest thereon;

B.   Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

C.   Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated:  June 3, 2019

Respectfully submitted,

**Kirby McInerney LLP**

By: _____

  Mark A. Strauss (mstrauss@kmllp.com)
  Ira M. Press (ipress@kmllp.com)
250 Park Avenue, 8th Floor
New York, New York 10177
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Attorneys for Plaintiff The Stone Family Trust*