UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE STONE FAMILY TRUST,

Plaintiff,

-against-

CREDIT SUISSE AG, CREDIT SUISSE
SECURITIES (USA) LLC, TIDJANE THIAM
and DAVID R. MATHERS,

Defendants.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _3/30/2022_____ |

19 Civ. 5192 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the Stone Family Trust, brings this action against Defendants Credit Suisse AG and Credit Suisse Securities (USA) LLC (together, "Credit Suisse") and two Credit Suisse executives, Tidjane Thiam and David R. Mathers (together, the "Individual Defendants"). Second Amended Complaint ("SAC"), ECF No. 35. Plaintiff's claims arise under (1) Sections 9(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78i, 78j, 78t; (2) Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o; (3) the Pennsylvania Securities Act (the "PSA"), 70 Pa. Cons. Stat. §§ 1-401(b), 1-501, 1-503; and (4) Pennsylvania common law. *Id.* ¶¶ 352–421. Defendants bring a partial motion to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Defs. Mot., ECF No. 37. For the reasons stated below, Defendants' motion is GRANTED in part, and DENIED in part.

<strong>BACKGROUND</strong>[1]

This case arises from the February 5, 2018 collapse of the market for XIV, an exchange traded note issued by Credit Suisse AG, the primary operating subsidiary of non-party Credit

---

[1] The following facts are taken from the second amended complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

Suisse Group AG.  *See generally* SAC.  Credit Suisse Securities (USA) LLC ("CSS") is a U.S.-based broker-dealer and affiliate of Credit Suisse AG that served as an underwriter and placement and redemption agent for XIV.  *Id*. ¶¶ 55–56.  At the time of the collapse, Tidjane Thiam was Credit Suisse's chief operating officer ("CEO") and a member of the Capital Allocation and Risk Management Committee (the "CARMC"), and David Mathers was Credit Suisse's chief financial officer ("CFO") and a member of the CARMC and the Valuation Risk Management Committee.  *Id*. ¶¶ 58–59.  Thiam assumed the CEO position in 2015, and Mathers became CFO in 2010.  *Id*.

    I.    <u>XIV</u>

Credit Suisse AG began issuing XIV in 2010.  *Id*. ¶ 1.  XIV's value tracked the daily inverse performance of Standard and Poor's ("S&P") 500 VIX Short-Term Futures Index ("VIX Index"), *id*., which measures the volatility of the stock market, *id*. ¶ 1 & n.1.  Generally, if the VIX Index declined by a certain percentage, because the market was less volatile, the value of XIV would increase by the same percentage, and vice versa.  *Id*. ¶¶ 1, 80.

To hedge its obligations with respect to XIV, Credit Suisse purchased and sold other securities and derivatives, primarily VIX futures contracts, which increased in value when the VIX Index increased in value.  *Id*. ¶¶ 4, 65, 71.  Every trading day, Credit Suisse would rebalance its portfolios and make decisions regarding whether to hedge its XIV obligations between 4:00 p.m., when the stock market closed, and 4:15 p.m., when the VIX futures market closed.  *Id*. ¶ 73.  If the VIX Index rose during a trading day, Credit Suisse would need to purchase VIX futures in quantities adequate to "rebalance its hedge."  *Id*. ¶ 75.  If Credit Suisse did not purchase a sufficient quantity of VIX futures, "Credit Suisse would own a massive unhedged exposure to volatility through [its] obligations, putting its own capital at risk."  *Id*.

Credit Suisse closely monitored its "rebalancing requirements" and XIV obligations. *Id.* ¶¶ 235–36.

"On at least three occasions prior to February 5, 2018, the market experienced a spike in the VIX Index and an even larger spike in the VIX futures price due to the[se] hedging activities." *Id.* ¶ 97; *see also id.* ¶¶ 98–100. After each spike in the VIX Index, Credit Suisse responded by purchasing large quantities of VIX futures, which drove up the value of the VIX Index and drove down the value of XIV notes. *Id.* ¶ 288. This effect was even more pronounced because there were "liquidity issues" in the VIX futures market—*i.e.*, a limited number of VIX futures were available—so the sudden increases in demand temporarily increased the price of VIX futures by even more than what would be expected based on market volatility alone. *Id.* ¶¶ 97, 103, 106. This excessive increase in the VIX futures price created a corresponding excessive decrease in the price of XIV. *See id.* ¶ 288. These events also illustrated that, due to liquidity issues, there would quickly become a point where there would not be enough VIX futures available to allow Credit Suisse to rebalance its hedges without a disproportionate impact on VIX futures prices, and, therefore, the price of XIV. *Id.*

Credit Suisse was aware of the three prior VIX spikes and their impact on the VIX futures market. *Id.* ¶¶ 97, 104–06, 109, 119, 234, 314. The Individual Defendants were informed about these prior VIX spikes in accordance with Credit Suisse's risk protocols. *Id.* ¶¶ 104–05, 109, 120, 290, 301, 314–17. Credit Suisse also took action in response to this risk, and, in July 2016, issued a press release announcing that the issuance of additional XIV notes would be conditioned on purchasers agreeing "to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy." *Id.* ¶ 115. This announcement was approved by the CARMC, which included Thiam and Mathers. *Id.* ¶ 266. These new

hedging instruments protected only Credit Suisse's interests, and not the interests of XIV investors. *Id.* ¶ 118.

In March 2017, Credit Suisse represented to the Securities and Exchange Commission (the "SEC") that it "actively monitor[s] risks and take[s] mitigating actions where they fall outside accepted levels," *id.* ¶¶ 267–68, and that senior management had "strong involvement" in Credit Suisse's risk management procedures, *id.* ¶¶ 269–70. Indeed, Thiam, as CEO, received "immediate notification" of any breaches of risk limits, which would include those related to XIV. *Id.* ¶¶ 274, 324–25. Moreover, on January 11, 2018, analysts warned that the risk that hedging may impact XIV and other similar products was "outsized" and "severe." *Id.* ¶ 248. Market professionals at other financial services firms also signaled that the "liquidity gap" in VIX futures could "unleash a monster." *Id.* ¶¶ 254–56.

Despite knowing that there was a limited number of VIX futures available for purchase at any one time, *id.* ¶¶ 127, 294, Credit Suisse continued issuing more XIV notes, *id.* ¶¶ 81, 127, 294. Because of its intimate knowledge of this market, Credit Suisse understood that the next time VIX's volatility spiked, as it did every few years, Credit Suisse's hedging would threaten "the very existence of XIV." *Id.* ¶ 81. Yet, in June 2017, Credit Suisse offered an additional five million XIV notes. *Id.* ¶ 82. Then, on January 29, 2018, Credit Suisse issued over sixteen million new XIV notes. *Id.* This growth in the XIV market created a grave risk that Credit Suisse's hedging activities "would have a large impact on VIX futures in the event of any relatively small increase in volatility." *Id.* ¶ 86. Specifically, there was a risk that even a small volatility increase would lead to a "liquidity gap," which would "cause a tremendous feedback loop of buying which would propel VIX futures skyward, causing XIV's value to plummet in a matter of minutes." *Id.* ¶ 87. The Individual Defendants were aware of this risk because the

expansion of XIV notes breached internal risk limits and required the approval of the CARMC. *Id*. ¶ 295.

In October 2017, Credit Suisse faced a possible "investor revolt" that was based on Credit Suisse's reliance on "volatile trading." *Id*. ¶¶ 138–39. When the events at issue in this case occurred, Credit Suisse was in the midst of a three-year restructuring plan in which it announced that it would "slash risky assets," like XIV, "in favor of its more stable wealth management division." *Id*. ¶ 131. This restructuring plan placed pressure on Credit Suisse to "ensure it closed out XIV at the first opportunity." *Id*. Thiam was involved in this plan to "reduce earnings volatility." *Id*. ¶ 133.

In connection with its January 29, 2018 issuance of new XIV, Credit Suisse filed with the SEC a prospectus supplement for the offer and sale of XIV (the "Prospectus"). *Id*. ¶ 3; *see also* Prospectus, ECF No. 39-1.[2] The Prospectus amended a registration statement filed in June 2017 and signed by both Thiam and Mathers. SAC ¶¶ 3, 202, 319. Together, the Prospectus and the amended registration statement comprised XIV's "Offering Documents." *Id*. ¶ 202. The Offering Documents warned investors of "extensive risks" related to the purchase of XIV notes. *Id*. ¶ 204. They also specified that XIV notes were intended for "sophisticated investors" and advised that purchasers should not hold XIV notes long-term because "it is likely that [they] will lose all or a substantial portion of [their] investment." *Id*. (alterations in original). The Prospectus also informed investors that "the long term expected value of your [XIV notes] is zero." *Id*. ¶ 209.

The Offering Documents disclosed Credit Suisse's intention to hedge its exposure to sales of XIV notes. *Id*. ¶ 204. But, they also stated that, although "there can be no assurance"

---

[2] The Court shall consider the Prospectus because it is "integral" to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also* SAC ¶ 29.

that the hedging will not affect the VIX Index, Credit Suisse had "no reason to believe that . . . [its] hedging activities will have a material impact on the level of the [VIX Index]." *Id*. ¶ 205. Additionally, the Offering Documents stated that Credit Suisse's hedging "may present" a conflict of interest because it could influence the level of the VIX Index in a way that "could be adverse" to investor interests. *Id*. ¶¶ 207, 213.

Credit Suisse also reserved the right to announce an "Acceleration Event" should XIV's price decline by 80% or more in a single day. *Id*. ¶¶ 19, 30, 175. If an Acceleration Event occurred, Credit Suisse would be required to pay investors an amount based on XIV's "Indicative Value." *Id*. ¶ 30. The Indicative Value was determined through a formula that was based on the daily inverse performance of the VIX Index. *Id*. ¶ 28. XIV's calculation agents determined and disseminated the Indicative Value. *Id*. Between 4:00 and 6:00 p.m. each trading day, the Indicative Value disseminated by the calculation agents was not properly updated because S&P, which published the VIX Index, "inexplicably" did not properly update the VIX Index during that time period. *Id*. ¶¶ 27, 31. As a result, XIV's Indicative Value was also generally inaccurate during that time. *Id*. ¶ 31. "Prior to February 5, 2018, the inaccuracy of the Indicative Value from 4:00 . . . to at least 6:00 p.m. . . . was immaterial given that volatility generally was stable after 4:00 p.m. . . . when the regular trading session for stocks closed." *Id*. ¶ 32.

The Prospectus informed prospective XIV investors that the Indicative Value would "be calculated every 15 seconds," and was "designed to reflect the economic value of [XIV] at a given time." *Id*. ¶ 225. It also explained that S&P would calculate the level of the VIX Index "in real time." *Id*. ¶ 227. But, the Prospectus warned that "the actual trading price" of XIV in the secondary market "may vary significantly" from the Indicative Value. *Id*. ¶ 226; *see also*

Prospectus at 40.  It also stated that the Indicative Value "calculation is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of [XIV], nor will it reflect hedging or transaction costs, credit considerations, market liquidity or bid-offer spreads."  Prospectus at 39.  And, it explained that the "[p]ublished underlying [VIX] Index levels from [S&P] may occasionally be subject to delay or postponement," which "will affect the current underlying [VIX] Index level and therefore the [Indicative Value] of [XIV]."  *Id.*

In November 2010, Credit Suisse provided information to the NASDAQ OMX PHLX Stock Exchange (the "PHLX") about potential inaccuracies in XIV's Indicative Value occurring after 4:00 p.m.  SAC ¶ 334.  In a circular that contained information purportedly provided by Credit Suisse AG, the PHLX warned that during "post-market sessions . . . additional risks may exist with respect to trading [n]otes" because "the underlying index's value . . . may not be disseminated."  *Id.* ¶ 335.

To monitor its XIV obligations and rebalancing needs and comply with regulatory requirements, Credit Suisse tracked the "real-time prices" of VIX futures.  *Id.* ¶ 190.  Credit Suisse did not rely on the VIX Index values disseminated by S&P because Credit Suisse needed to know the price of XIV "on at least a millisecond basis."  *Id.*

II.    Events of February 5, 2018

On February 5, 2018, by around 4:00 p.m., the VIX Index rose 33% from the day before. *Id.* ¶ 21.  As would have been expected, XIV's Indicative Value then fell by 33%.  *Id.*  Between, 4:00 and 4:15 p.m., Credit Suisse and other providers of similar volatility notes rebalanced their hedges.  *Id.* ¶ 22.  This rebalancing set off a "feedback loop" or a "death spiral" in which the price of VIX futures rose sharply, which drove down XIV's value, necessitating the purchase of

more VIX futures.  *Id*.  At around 4:15 p.m., Credit Suisse knew that the price of XIV had

dropped by more than 80% from the previous day's closing value, and thus, an Acceleration

Event had occurred.  *Id*. ¶ 23.  In fact, XIV lost 96% of its value.  *Id*. ¶ 24.  The bulk of these

losses occurred in the 15-minute period between 4:00 and 4:15 p.m.  *Id*.  That day, Plaintiff

purchased more than $43 million in XIV notes between 3:50 and 5:38 p.m.  *Id*. ¶ 2.

After 4:00 p.m. on February 5, 2018, XIV's Indicative Value was materially overstated,

which obscured XIV's instability.  *Id*. ¶ 33.  Because the S&P data feed for the VIX Index failed

to properly update, the price changes in VIX futures were not showing a corresponding change in

the Indicative Value.  *Id*.  Instead, for 55 minutes, XIV's Indicative Value remained relatively

stable at around $25, even as the "value plummeted to virtually nothing."  *Id*.  Plaintiff, who

traded XIV after 4:00 p.m. on February 5, 2018, was, therefore, unaware of the true extent of

XIV's decline.  *Id*. ¶ 35.

The next day, Credit Suisse declared an Acceleration Event and forced all investors to

redeem their XIV for $5.99 per note, which was a small fraction of what they had paid.  *Id*.

¶¶ 26, 54.  Due to this confluence of events, Plaintiff lost approximately $37.7 million.  *Id*. ¶ 54.

Credit Suisse likely earned millions of dollars.  *Id*. ¶ 196.

Immediately after XIV's collapse, the SEC began investigating the role Credit Suisse

played in connection with the events described above.  *Id*. ¶ 162.  On February 14, 2018, Thiam

stated publicly that the Acceleration Event "was actually to protect investors."  *Id*. ¶ 165.  On

March 23, 2018, Thiam was awarded a $10 million bonus for his work in managing the strategic

shift away from risky assets in 2017.  *Id*. ¶ 169.

III.    <u>Procedural History</u>

After several plaintiffs sued Credit Suisse, the Individual Defendants, and the entity

responsible for calculating XIV's Indicative Value, the lawsuits were consolidated into a class

action complaint filed by Set Capital on August 20, 2018.  *See Set Capital LLC, et al. v. Credit*

*Suisse Group AG et al.*, No. 18 Civ. 2268, ECF No. 82 (S.D.N.Y. Aug. 20, 2018).  The

complaint alleged violations principally under Sections 9(a), 10(b), and 20(a) of the Exchange

Act and Sections 11 and 15 of the Securities Act.  *Id.*

On November 2, 2018, the defendants moved to dismiss the plaintiffs' claims, *see id*. at

ECF Nos. 101, 105, and the undersigned referred those motions to the Honorable Sarah Netburn,

*id*. at ECF No. 113.  Judge Netburn issued a Report and Recommendation ("R&R")

recommending the dismissal of all of the plaintiffs' claims based on their failure to properly

plead primary violations of Sections 9(a) and 10(b) of the Exchange Act and Section 11 of the

Securities Act.  *Id*. at ECF No. 124.  Specifically, Judge Netburn found that the plaintiffs failed

to allege an actionable misstatement or omission in the Offering Documents, and that, although

the plaintiffs sufficiently alleged acts of market manipulation and misrepresentation in the

Indicative Value, they failed to allege facts supporting a strong inference of scienter.  *See*

*generally id*.  Because Judge Netburn found that the plaintiffs failed to allege a primary

violation, she also, therefore, recommended the dismissal of the plaintiffs' control person claims

under Sections 15 and 20(a).  *Id*.

On September 25, 2019, the undersigned issued an order adopting Judge Netburn's R&R

in full and dismissing the action with prejudice.  *See generally id*. at ECF No. 135.  The plaintiffs

appealed, and the Second Circuit vacated the judgment dismissing the claims pertaining to the

manipulative scheme, the alleged misstatements or omissions in the Offering Documents, and the

corresponding liability of control persons, and remanded those claims for further proceedings. *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 87 (2d Cir. 2021).  The Second Circuit affirmed the dismissal of the claims based on the failure to correct the Indicative Value but vacated this Court's denial of leave to amend those claims.  *Id.*

Plaintiff opted not to participate in the class action and filed its own complaint on June 3, 2019.  *See* ECF No. 1.  Plaintiff amended its complaint for a second time.  SAC.  Defendants now move to dismiss Plaintiff's claims based on the alleged misrepresentations related to XIV's Indicative Value under Sections 9(a), 10(b), and 11, Plaintiff's claims for control person liability under Sections 15 and 20(a), and Plaintiff's state law claims.  Defs. Mem. at 2, ECF No. 38.[3]

## ANALYSIS

I.   Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  But, for claims sounding in fraud, including those involving securities fraud, plaintiffs must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires them to state "with particularity[,] the circumstances constituting fraud.  *See* Fed. R. Civ. P. 9(b); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). A plaintiff's claims for securities fraud must also satisfy the requirements for pleading scienter

---

[3] Defendants also move to dismiss Plaintiff's claims for alleged violations of various SEC regulations and other rules.  Defs. Mem. at 14–17.  Because Plaintiff does not clearly raise these claims in its second amended complaint, and, indeed, disclaims bringing such claims, *see* Pl. Mem. at 2–3, ECF No. 40, this portion of Defendants' motion is DENIED as moot.

under the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b), and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id*. § 78u-4(b)(2)(A).

    II.    <u>Application</u>

        A.  Sections 10(b), 9(a), and 11

            1.  Section 10(b)

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Rule 10(b)(5), promulgated under Section 10(b), in relevant part, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Section 10(b) operates as a "broad" prohibition against manipulation in the form of false statements. *See United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008); *ATSI Commc'ns*, 493 F.3d at 99.

To state a claim under Section 10(b) and Rule 10(b)(5), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). To satisfy Rule 9(b)'s heightened pleading requirement plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99; *see also* Fed. R. Civ. P. 9(b). Moreover, to comply with the PSLRA, plaintiffs must "specify each statement

alleged to have been misleading, the reason or reasons why the statement is misleading, and, if

an allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed." *Id*. (quoting 15

U.S.C. § 78u-4(b)(1)).

In general, "where there is disclosure that is broad enough to cover a specific risk, the

disclosure is not misleading simply because it fails to discuss the specific risk." *In re Bank of

Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x

93 (2d Cir. 2014).  But, "cautionary words about future risk cannot insulate from liability an

issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually

certain to materialize again." *Set Capital*, 996 F.3d at 85.  Moreover, although "Rule 10b-5

imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it

has a 'duty to be both accurate and complete.'"  *Plumbers' Union Local No. 12 Pension Fund v.

Swiss Reins. Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting *Caiola v. Citibank*, 295

F.3d 312, 331 (2d Cir. 2002)).

The materiality of misrepresentations or omissions is "'judged according to an objective

standard' that turns on 'the significance of an omitted or misrepresented fact to a reasonable

investor.'"  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Amgen Inc.

v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 467 (2013)).  A misstatement or omission

is considered material so long as there is "a substantial likelihood that a reasonable investor

would find the . . . misrepresentation important in making an investment decision." *United

States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (citation omitted).  And, misrepresentations are

considered "important" when there is "a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id*. (quotation marks and citation omitted).

Moreover, to satisfy the scienter requirement, plaintiffs claiming securities fraud must "(1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000). Courts evaluate the sufficiency of a plaintiff's allegations of scienter "holistically," and consider "all of the facts alleged, taken collectively," rather than "any individual allegation, scrutinized in isolation." *Set Capital*, 996 F.3d at 78 (citations omitted). Furthermore, for an inference of scienter to satisfy the PSLRA's requirements, "a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. (citation omitted).

### 2. Section 9(a)

Like Section 10(b), Section 9(a) prohibits the use of a false or misleading statement in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78i(a)(4). Plaintiffs pleading claims under Section 9(a)(4) must show "a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Salvani v. ADVFN PLC*, 50 F.Supp. 3d 459, 476 (S.D.N.Y. 2014) (citation omitted), *aff'd*, 628 F. App'x 784 (2d Cir. 2015). The analysis of claims under Section 9(a) "closely parallels" the analysis of claims under Section 10(b). *See I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 539 (S.D.N.Y. 2017).

13

3.   Section 11

Section 11 "imposes civil liability on issuers and other signatories of a registration statement if the registration statement contains material misstatements or omissions and the plaintiffs acquired the securities without knowledge of such misrepresentations." *McMahan & Co. v. Wherehouse Ent.*, 65 F.3d 1044, 1047 (2d Cir. 1995).  Unlike plaintiffs bringing claims under Sections 10(b) and 9(a), plaintiffs bringing claims under Section 11 "need only plead a material misstatement or omission in the registration statement to establish a *prima facie* fraud claim."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), *abrogated on other grounds*, 574 F.3d 29 (2d Cir. 2009).  They are not required to plead "loss causation," *id.*, or to allege scienter, *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004).  But, if a Section 11 claim is "premised on allegations of fraud," then "the heightened pleading standard of Rule 9(b) applies. . . ."  *Id.* at 171.

4.   Plaintiff's Allegations

Defendants contend that Plaintiff's allegations regarding the alleged inaccuracy of XIV's Indicative Value fail primarily because Plaintiff (1) has not identified an actionable misstatement or omission and (2) has not alleged that Defendants acted with scienter.  Defs. Mem. at 9.  The Court agrees.

Plaintiff argues that the Prospectus both made a misstatement of fact, by stating that the Indicative Value would be calculated every 15 seconds, and omitted a material fact, by not stating that the Indicative Value was not properly updated between 4:00 and 6:00 p.m. each trading day.  *See* Pl. Mem. at 9–14.  The Court shall address these arguments in turn.

As to the first argument, the Court concludes that Defendants did not make a misstatement.  Although Defendants did say that the Indicative Value would be calculated every

14

15 seconds, Defendants cautioned that the actual trading price of XIV "may vary significantly" from that calculated value.  SAC ¶ 226.  And, the Prospectus also specifically disclosed that the Indicative Value may be subject to "delays or postponements."  Prospectus at 39.  Because of these clear warnings, this statement is not materially misleading.

Furthermore, Plaintiff has failed to allege that Defendants made a material omission. Plaintiff argues that the omitted information was material because "the accuracy and reliability of the Indicative Value were critical to the market trading XIV."  Pl. Mem. at 10.  Although the Court agrees that a reasonable investor may find the accuracy of XIV's Indicative Value material, this argument does not address the actual question before this Court.  The Prospectus clearly disclosed that the Indicative Value may be inaccurately reported and explained why this might occur.  *See* Prospectus at 39.  Therefore, the question is whether a reasonable investor would have found material the *omitted* fact, namely, that the Indicative Value was inaccurately reported at some point each trading day between 4:00 and 6:00 p.m.

Plaintiff has not alleged any facts indicating that a reasonable investor would find this fact material if they already knew that the Indicative Value may be inaccurate and delayed. Indeed, Plaintiff asserts both in its second amended complaint and in its briefing to this Court, that this very fact was "*immaterial*" when the Prospectus was issued because "[p]rior to February 5, 2018, . . . volatility generally was stable after 4:00 p.m."  *See* Pl. Mem. at 8 (emphasis added); SAC ¶ 32.  Thus, Plaintiff has failed to plausibly allege that Defendants made a material omission by not disclosing this fact in the Prospectus.  *Cf. Shetty v. Trivago N.V.*, 796 F. App'x 31, 35 (2d Cir. 2019); 15 U.S.C. § 77k(a) (stating that liability under Section 11 is incurred when "any part of the registration statement, *when such part became effective*, contained an untrue statement of a material fact or omitted to state a material fact" (emphasis added)).

15

Additionally, the Court finds that Plaintiff has failed to allege that Defendants acted with scienter, a requirement of Sections 9(a) and 10(b).  Plaintiff's arguments in support of scienter rest on Defendants engaging in "conscious misbehavior or recklessness" with respect to their omission of the fact that the Indicative Value was not properly updated each trading day between 4:00 and 6:00 p.m.  Pl. Mem. at 15–17.  These arguments are based primarily on Credit Suisse's allegedly imparting to the PHLX that "additional risks may exist" with respect to trading XIV during "post-market sessions" because the VIX levels "may not be disseminated" during that time.  *See* Pl. Mem. at 15 (quoting SAC ¶¶ 335–36).  Although this allegation may show that Credit Suisse thought it necessary to disclose, in this context, a more specific version of the risk it disclosed in the Prospectus, the allegation does not show Defendants' knowledge of the "known specific risk" Plaintiff identifies—namely, that the Indicative Value was not updated each trading day between 4:00 and 6:00 p.m.  *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010).  Plaintiff's other allegations also fail to raise an inference that Defendants knew about this omitted fact.  Indeed, Plaintiff alleges that Defendants did not monitor the price of XIV using the Indicative Value or the VIX Index levels reported by S&P because they required information "on at least a millisecond basis."  SAC ¶ 190.

Accordingly, Defendants' motion to dismiss Plaintiff's claims under Rule 10b-5 and Sections 9(a), 10(b), and 11 based on the failure to disclose that the Indicative Value was not properly updated between the hours of 4:00 and 6:00 p.m. each trading day is GRANTED.

B.  Sections 20(a) and 15

1.  Section 20(a)

Section 20(a) provides for control person liability for underlying Section 9(a) and 10(b) and Rule 10b-5 securities law violations.  *See* 15 U.S.C. § 78t(a).  Specifically, Section 20(a) states that

> every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*Id*.

To state a claim under 20(a), plaintiffs must allege (1) "a primary violation by a controlled person," and (2) "control by the defendant of the primary violator."  *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004).  Control in this situation is defined according to SEC regulations, which describe "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *See In re Bernard L. Madoff Inv. Sec. LLC*, 739 F. App'x 679, 685 (2d Cir. 2018) (quoting 17 C.F.R. § 230.405).  Plaintiffs must also show "culpable participation in some meaningful sense by the controlling person in the fraud."  *In re Global Crossing*, 322 F. Supp. 2d at 349 (quotation marks and citation omitted); *see also In re Bernard L. Madoff*, 739 F. App'x at 685.

2.  Section 15

Section 15 essentially parallels Section 20(a) and provides control person liability for claims brought under Section 11.  *In re Global Crossing*, 322 F. Supp. 2d at 349.  But, the majority of courts in this district have concluded that culpable participation is not required to

17

state a claim under Section 15.  *See Francisco v. Abengoa, S.A.*, No. 15 Civ. 6279, 2021 WL 4136899, at \*26 (S.D.N.Y. Sept. 10, 2021) (collecting cases).

### 3.   Plaintiff's Allegations

Because Plaintiff has failed to allege that Defendants committed a primary violation with respect to their statements or omissions regarding XIV's Indicative Value, Plaintiff's control person claims based on those violations are dismissed.  *See In re Global Crossing*, 322 F. Supp. 2d at 349.  But, as discussed above, Defendants concede for the purposes of this motion that Plaintiff has successfully alleged that Defendants committed primary violations with respect to their alleged market manipulation and their statements regarding the risks their hedging activities posed to the price of XIV.  *See* Defs. Mem. at 2.  Defendants contend that the Court should dismiss Plaintiff's control person claims based on the surviving securities law violations because Plaintiff fails to allege "the control and culpable participation required to establish these claims." *Id*. at 17–18.

Plaintiff first argues that its control person claims succeed because these claims are "in all material respects identical" to the claims reinstated by the Second Circuit in *Set Capital*.  Pl. Mem. at 20 (citing *Set Capital*, 996 F.3d at 82, 86).  This argument is unavailing.  Although the Second Circuit reinstated the plaintiffs' control person claims in *Set Capital*, it did not express any opinion on whether those claims should succeed on remand to the district court.  *See Set Capital*, 996 F.3d at 82, 86.  Thus, the Court shall not allow Plaintiff's control person claims to proceed on that basis alone.

Next, Plaintiff argues that it adequately alleged that the Individual Defendants controlled Credit Suisse and culpably participated in the fraud.  The Court agrees.  Plaintiff has sufficiently shown that both Thiam and Mathers had the power to direct the management and policies of

Credit Suisse by virtue of their respective positions as CEO and CFO, and their signing of the Offering Documents.  *See* SAC ¶¶ 58–60, 104–05, 202; *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013); *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011).

Moreover, Plaintiff has also successfully alleged the Individual Defendants' culpable participation in the fraud.  In addition to claiming that the Individual Defendants signed the Offering Documents, Plaintiff also asserts that the Individual Defendants, as members of the CARMC, approved the July 2016 announcement requiring purchasers to sell Credit Suisse hedging instruments, which reflects an understanding of the liquidity issues in the VIX futures market.  SAC ¶¶ 115, 266.  Plaintiff also claims that the Individual Defendants were necessarily aware of the risks posed by the issuance of additional XIV notes pursuant to Credit Suisse's risk assessment protocols.  *Id*. ¶¶ 269–70, 295.[4]

But, Plaintiff has not sufficiently shown that Credit Suisse AG or CSS had control over any party involved in the primary violation.  Plaintiff makes no arguments in support of Credit Suisse AG's or CSS's control, and the second amended complaint contains only one conclusory statement that "Credit Suisse AG and CSS[] . . . controlled the Individual Defendants."  SAC ¶ 390.

Accordingly, Defendants' motion to dismiss the control person claims against Credit Suisse AG and CSS, as well as the control person claims related to XIV's Indicative Value, are GRANTED, and their motion to dismiss the control person claims against the Individual Defendants as to the alleged market manipulation and related misrepresentations is DENIED.

---

[4] The Court notes that Plaintiff has set forth further allegations that specifically demonstrate Thiam's knowledge of and involvement in the alleged manipulative scheme.  *See* SAC ¶¶ 133, 138–39, 273–74, 324–25.

### C.  State Law Claims

In its second amended complaint, Plaintiff brings "Pennsylvania Law Claims" under the
PSA, as well as common law claims for negligent misrepresentation and fraud under
Pennsylvania law.  SAC ¶¶ 393–421.  Defendants challenge Plaintiff's pleading of these claims,
*see* Defs. Mem. at 19–25, and, in response, Plaintiff argues in support of only its common law
fraud claims, Pl. Mem. at 23–25.  The Court, therefore, deems abandoned the claims under the
PSA and the claim for negligent misrepresentation.  *See Felix v. City of New York*, 344 F. Supp.
3d 644, 654–55 (S.D.N.Y. 2018).

Additionally, although Plaintiff does defend its claim based on common law fraud under
Pennsylvania law, its arguments rely on the application of New York law.  *See* Pl. Mem. at
23–25.  As Plaintiff has clearly pleaded its common law fraud claim under Pennsylvania law, *see*
SAC at 118 (labeling the state law claims as "Pennsylvania Law Claims"); *id*. at 122 (labeling
Count IX as a claim for "Common Law Fraud under Pennsylvania Law"), the Court construes
these arguments as an attempt by Plaintiff to improperly amend its complaint through its
opposition brief, *see Baez v. Anne Fontaine USA, Inc.*, No. 14 Civ. 6621, 2017 WL 57858, at *6
(S.D.N.Y. Jan. 5, 2017); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

Accordingly, Defendants' motion to dismiss Plaintiff's Pennsylvania state law claims is
GRANTED.

### D.  Leave to Amend

Defendants ask the Court to dismiss Plaintiff's claims with prejudice.  Defs. Mem. at 3,
25.  Plaintiff requests leave to amend its complaint.  *See* Pl. Mem. at 25 n.26.

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to
amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Because the Court is not persuaded

that Plaintiff cannot cure the deficiencies in its allegations, Plaintiff may file a motion for leave to further amend its complaint within 21 days of this order.  Such a motion may not include a request for leave to amend those Pennsylvania state law claims deemed abandoned.  *See Verdi v. City of New York*, 306 F. Supp. 3d 532, 552 (S.D.N.Y. 2018).

**CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED in part, and DENIED in part.  The Clerk of Court is directed to terminate the motion at ECF No. 37.

SO ORDERED.

Dated: March 30, 2022
       New York, New York

_____
ANALISA TORRES
United States District Judge